**Mayer Brown LLP**
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
Email: dspelfogel@mayerbrown.com
        leisenberg@mayerbrown.com
        dchung@mayerbrown.com

*Co-Counsel to the Plaintiff*

**BACKENROTH FRANKEL &
KRINSKY, LLP**
Mark Frankel
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Plaintiff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- X
In re:                                               :
                                                     :   Chapter 11
96 Wythe Acquisition LLC,                            :   Case No. 21-22108 (RDD)
                                                     :
                    Debtor.                          :
                                                     :
----------------------------------------------------- X
96 Wythe Acquisition LLC,                            :
                                                     :
                    Plaintiff,                       :
                                                     :
        -against-                                    :
                                                     :
Benefit Street Partners Realty Operating             :   Adv. Pro. No 21-_____
Partnership, L.P.,                                   :
                                                     :   **COMPLAINT**
                    Defendant.                       :
----------------------------------------------------- X

743468868

Plaintiff 96 Wythe Acquisition LLC (the "Debtor" or the "Plaintiff"), by and through its undersigned counsel, Mayer Brown LLP, as and for its Complaint against Benefit Street Partners Realty Operating Partnership, L.P. (the "Lender" or the "Defendant"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1. The Debtor owns and operates the boutique Williamsburg Hotel (the "Hotel") in Williamsburg, Brooklyn. Through financing provided by a construction lender prior to the Lender (in addition to substantial equity financing and loans), the Debtor conceptualized, designed and constructed the Hotel from scratch, building it out into a boutique hotel accommodation in the heart of Brooklyn's hip Williamsburg neighborhood.

2. The Lender was brought in to replace and refinance the construction lender following the opening of the Hotel, and to allow for the final completion of construction when the Hotel was already mostly operational. The purpose of the Lender's loan was to provide a bridge loan for up to two and a half years, during which time the Hotel's construction would be completed and its operations would stabilize at or near full capacity, after which the Debtor would then refinance into a permanent mortgage loan.

3. However, although the Debtor successfully completed the Hotel's construction and stabilized the Hotel (thereby effectively eliminating the Lender's risk of nonpayment), pursuant to the terms of the Loan Agreement (defined below) between the Debtor and the Lender, the foregoing was not good enough for the Lender. The Debtor instead found itself dealing with a predatory lender, whose apparent goal was to seize ownership over the Hotel from the Debtor by any means necessary, causing the Debtor and its equityholders to lose all of their value and investment in the Hotel project.

4.      Instead of allowing the Debtor to move forward with a refinancing of the Lender's debt, as had always been contemplated, the Lender engaged in a course of misconduct designed to enrich itself while depriving the Debtor of the benefit of its bargain.

5.      Specifically, the Lender waged a campaign of abuse, and perpetrated a scheme through which it circumvented its obligations—in contravention of the Debtor's rights under the Loan Agreement—by, among other things: (i) improperly refusing to acknowledge the completion date of Hotel construction despite documents, reports and supporting information confirming that the Hotel was substantially completed within the terms of the Loan Agreement; (ii) improperly increasing the interest rate; (iii) improperly withholding Debtor funds; (iii) improperly claiming the Debtor's interest reserve was not sufficiently funded; and (iv) as a result of and/or as a basis for the foregoing, fabricating serial defaults, which provided the Lender with an unfair advantage, leaving the Debtor with no option but to either succumb to the Lender's improper demands to pay exorbitant and unauthorized interest and fees or jeopardize the entire Hotel project.

6.      As explained more fully below, Lender has taken such unsubstantiated, false and/or bad faith actions in the administration of this loan. The foregoing fabricated and false "defaults" and other claims by the Lender, and their corresponding adverse actions taken by Lender against the Borrower, have no basis then or now, and do not withstand scrutiny as explained below. As a direct result of the Lender's misconduct—whether expressly in violation of the Debtor's contractual and property rights or in violation of the implied covenant of good faith and fair dealing—the Debtor has been forced to defend itself in a protracted foreclosure case and an interlocutory appeal of a favorable order and then file the above-captioned Chapter 11 bankruptcy case (the "Chapter 11 Case").  Due to the Lender's actions, and while facing the devastating effects of the COVID-19 pandemic, the Debtor's ability to operate its business has been severely impaired

and its other creditors' ability to receive payments from the Debtor in the ordinary course of business has been restricted.

7.      The Debtor believes that the foregoing course of conduct by the Lender was intentionally conceived of and executed by the Lender with the goal of obstructing the Debtor's own compliance with, and ultimately, exit from, the Loan Agreement, for the purpose of accelerating payment obligations on the debt in order to enrich itself further with exorbitant and unauthorized interest and fees, seizing the Hotel for itself at a substantial discount to the market value of the Hotel, and then turning around and selling the Hotel at the market price while capturing additional profits for itself.

8.      The Lender's improper and/or predatory actions leading up to and continuing in this bankruptcy case provides further evidence of its scheme.  Separate from its endless litigation against the Debtor, and its efforts to stymie the orderly progress of the bankruptcy case, the Lender now apparently wishes to propose a chapter 11 plan of liquidation pursuant to which the Hotel would be sold, with the Lender itself serving as stalking horse bidder and being entitled to credit bid the full amount of its inflated claim, effectively precluding competitive bidding in what is still a troubled market in light of the pandemic.

9.      Under these circumstances, equity dictates that the Court intervene to ensure fairness and justice in the reorganization process.  Equitable doctrines authorize this Court to rearrange the priorities of creditors' interests and to place all or part of a wrongdoer's claim in an inferior status, in order to achieve a just result in the reorganization of a debtor.  Here, if the Lender is allowed to collect additional interest, default interest and resulting fees and expenses—all of which directly resulted from the Lender's predatory misconduct, and are disputed—the Lender will have gained an unfair advantage and harmed not only the Debtor, but all lower priority

creditors and interest holders as well.  Accordingly, the Court should equitably subordinate or equitably disallow the portion of the Lender's claim that arises from such additional and improper purported charges under the Loan Agreement.

10.     Likewise, the Debtor should be compensated for the Lender's misconduct in violation of express and implied terms of the contracts between the Debtor and the Lender and misappropriation of the Debtor's own funds.

11.     Finally, the Lender's claim lacks legal and factual support in numerous material respects and, for that reason, should be disallowed to the extent it cannot prove its entitlement to excessive charges asserted in its proof of claim.

12.     For all of these reasons, and as described in more detail below, a money judgment should be entered against the Lender in this proceeding to compensate the Debtor for the harms done to it, and the Lender's claim should be disallowed and or reduced as provided for herein.

## NATURE OF THE PROCEEDING

13.     The Debtor brings this action in order to recover damages from the Defendant for, among other things, its breach of contract, breach of its implied duty of good faith and fair dealing, unjust enrichment at the expense of the Debtor and other creditors, and conversion of the Debtor's property. This action also asserts an objection to Defendant's claim in the Chapter 11 Case and seeks equitable subordination and equitable disallowance of a portion of the Defendant's claim.

## THE PARTIES

14.     Plaintiff is a New York limited liability company with its principal place of business at 96 Wythe Avenue, Brooklyn, New York, 11249.

15.     Plaintiff is the Chapter 11 debtor-in-possession in the above-captioned Chapter 11 Case.

16.     The Plaintiff owns and operates the Hotel, a historically successful 147 room hotel located at 96 Wythe Avenue, Brooklyn, New York, which is now fully operational after its business was severely curtailed both as a result of the Lender's behavior and then during the initial stages of the COVID-19 pandemic.

17.     On February 23, 2021 (the "Petition Date"), the Plaintiff filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors or trustee has been appointed in this Chapter 11 Case.

18.     Upon information and belief, Defendant is a Delaware limited partnership with an address at 142 West 57th Street, Suite 1201, New York, New York 10019.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") because the Plaintiff is debtor in the above-captioned bankruptcy case pending in the United States Bankruptcy Court for the Southern District of New York.

20.     The legal predicates for the claims asserted herein are sections 105(a) 502, 510, 541, and 542 of Title 11 of the United States Code (the "Bankruptcy Code"), and New York common law.

21.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A), (b)(2)(B), and (b)(2)(O).

22.     This Court has the statutory and constitutional authority to enter a final judgment with respect to all claims asserted in this Complaint.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## GENERAL ALLEGATIONS

A.    **The Loan Transactions**

24.    On December 13, 2017, Plaintiff and Lender entered into a $68 million loan consolidation transaction (the "Loan"), consolidating approximately fourteen mortgages, by entering into several agreements including (i) that certain Loan Agreement, dated as of December 13, 2017 (the "Loan Agreement"), a true and correct copy of which is attached hereto as **Exhibit A** (ii) that certain Consolidation, Extension and Restatement of Notes Agreement dated as of December 13, 2017 (the "Consolidated Note"), a true and correct copy of which is attached hereto as **Exhibit B**; (iii) that certain Consolidation Modification, Spreader and Extension, dated as of December 13, 2017 (the "Consolidated Mortgage"), a true and correct copy of which is attached hereto as **Exhibit C**; (iv) that certain Guaranty of Recourse Obligations, dated as of December 13, 2017, by and between the Lender, Toby Moskovits, and Yechiel Michael Lichtenstein (the "Guaranty"), a true and correct copy of which is attached hereto as **Exhibit D**; and (v) that certain Intercreditor Agreement, dated as of December 13, 2017, by and between Lender and WH Mezz Lender, LLC (the "Intercreditor Agreement" and, together with the Loan Agreement, Consolidated Note, Consolidated Mortgage, and Guaranty, the "Loan Documents"), a true and correct copy of which is attached hereto as **Exhibit E**.[1]

25.    To provide additional financing for the construction and operation of the Hotel, one of the two direct parents of the Debtor, 96 Wythe Mezz DE LLC (the "Mezz Borrower"), entered into a Mezzanine Loan Agreement dated as of December 13, 2017 (the "Mezzanine Loan Agreement") with WH Mezz Lender, LLC (the "Mezz Lender"). Pursuant to the Mezzanine Loan

---

[1] Each of the Loan Documents and other exhibits hereto is incorporated by reference in this Complaint.

Agreement, the Mezz Lender provided up to $12,500,000 in debt financing to the Mezz Borrower, to be invested in the Debtor and secured by the Mezz Borrower's equity interest in the Debtor.

26.    As set forth in more detail below, certain aspects of the relationships among the Debtor, Lender, Mezz Borrower, and Mezz Lender are set forth in the Intercreditor Agreement.

27.    Through a series of assignments to affiliates of the Lender, the Loan and related Loan Documents were transferred to an entity called BSPRT 2018-FL3 ISSUER, LTD., which was the initial plaintiff in the foreclosure action discussed below.  During the pendency of said foreclosure action, the Loan and related Loan Documents were assigned back to Lender.

28.    Notwithstanding this series of assignments, the Debtor's points of contact with respect to the Loan remained with Benefit Street Partners Realty Operating Partnership L.P. (*i.e.*, the original and current "Lender") and its servicer, Situs Asset Management LLC (the "Servicer").[2]

**B.**    **Key Loan Document Provisions**

29.    The Operating Condition.  At the time of the execution of the Loan Agreement and other Loan Documents in 2017, the Debtor's construction of the Hotel was nearly complete. Among other things, the Loan Agreement sets forth a timeline for the substantial completion of the remaining construction on the Hotel and the commencement of the Hotel's operations in all guest rooms and at each bar and other venue in the Hotel.  In connection therewith, the Loan Agreement establishes certain consequences to the Debtor for any failure to meet that timeline.

30.    First, if the "Operating Condition" was not satisfied prior to May 31, 2018, the interest rate accruing on the Loan would be increased by 0.50%.  However, upon satisfaction of the Operating Condition, the 0.50% interest rate increase would be eliminated going forward. Loan Agreement p. 14 (definition of "LIBOR Rate").

---

[2] Accordingly, all references to "Lender" herein are inclusive of (1) whichever entity technically held the Loan at any particular time and (2) the Servicer, acting on behalf of the Lender.

31.    "Operating Condition," is defined to mean "(1) Completion of the Business Plan Work (for the avoidance of doubt, including all Critical Hotel Features) in accordance with the terms of [the Loan Agreement] and (2) Critical Hotel Features are fully open for business and operating, in each case as determined by Lender."   The defined terms that are essential to understanding and interpreting the meaning of the Operating Condition are as follows:

a.    "Completion" means "the **substantial completion** of the Business Plan Work on or prior to the Completion Date substantially in accordance with all Plans and Specifications, the Business Plan, all Legal Requirements, and this Agreement such that the Property is ready for full occupancy, such compliance to be evidenced to the satisfaction of Lender; together with the delivery to Lender of one or more temporary certificate of occupancy (if subject to any conditions, such conditions being acceptable to Lender) for all Improvements and evidence that all other approvals from Governmental Authorities have been issued and all other Legal Requirements have been satisfied **so as to allow the Improvements to be used and operated** in accordance with the Loan Documents." Loan Agreement p. 6 (definition of "Completion").

b.    "Business Plan Work" means "all work and costs contemplated to be incurred pursuant to the Business Plan," which, in turn, is the Debtor's "plan to pay for and complete all capital improvements at the Property . . . ."  Loan Agreement p. 4-5 (definitions of "Business Plan" and "Business Plan Work").

c.    The "Critical Hotel Features" are "all guest rooms, the pool and related facilities, all food and beverage outlets (including the watertower bar and rooftop bar area) and all other Improvements necessary for the full use and operation of any of the foregoing."  Loan Agreement p.7 (definition of "Critical Hotel Features").

32.    In addition to the interest rate consequences, it is an Event of Default under the Loan Agreement if the Operating Condition is not satisfied by the December 31, 2018 "Completion Date," and the Loan Agreement otherwise requires "Completion" to occur by such date. *See* Loan Agreement § 10.1(s).

33.    <u>The Reserve Accounts</u>. The Loan Agreement also required the Debtor to establish several reserve accounts, including a Business Plan Reserve Account and an Interest Reserve Account.

34.     The Business Plan Reserve Account is a deposit account, funded by the Debtor at the initial closing of the Loan, held by the Lender in an initial amount of $1,651,000.  The Business Plan Reserve Account was established to pay the costs of certain of the remaining construction work necessary to open the remaining then-incomplete bars, including the rooftop bar, and to complete the other Business Plan Work.  The Business Plan Reserve Account was required to be funded by proceeds of capital contributions from the Debtor and not from funds received from the Lender under the Loan Agreement.  Loan Agreement § 7.8.

35.     By agreement of the parties, the remaining Business Plan Work was to be completed by the Debtor, at no risk to the Lender, and the flow of payments was to be managed as follows: (i) first, the Debtor would fund and pay for all needed contractors, materials and services in the first instance; (ii) next, the Debtor would certify completion of such work to Lender in regular increments, providing copies of lien releases from all contractors and subcontractors and scheduling a construction site visit with Lender's agent, and (iii) finally, the Lender would reimburse Debtor for all such payments out of the Business Plan Reserve Account (that is, the Lender would "reimburse" the Debtor from the Debtor's own money).

36.     The Interest Reserve Account is a deposit account held by the Lender in an initial amount of $2,400,000, which was established to be held "as additional security for the Debt and all of the other Obligations" under the Loan Agreement.  The Debtor was required to maintain a minimum balance in the Interest Reserve Account sufficient "to pay Debt Service projected to be due and payable during the next ensuing two (2) month period[.]"  Loan Agreement § 7.9.

37.     At all relevant times, the Business Plan Reserve Account, the Interest Reserve Account, and the other reserve accounts remained property of the Debtor.

38.     <u>The Maturity Date</u>.  The Loan Agreement's original stated maturity date was June 7, 2019 (the "<u>Initial Maturity Date</u>").  However, under Section 2.11 of the Loan Agreement, the Debtor had the option "to extend the term of the Loan beyond the initial Maturity Date for two (2) successive terms (the 'Extension Option') of six (6) months each (each, an 'Extension Period') to (i) December 9, 2019 if the first Extension Option is exercised and (ii) June 9, 2020 if the second Extension Option is exercised (each such date, the 'Extended Maturity Date')" if certain conditions were met, including, but not limited to, the absence of any outstanding Events of Default under the Loan Documents at the time of the extension.  Loan Agreement § 2.11.

39.     <u>Cure of Monetary Defaults</u>.  Section 10.1(u) of the Loan Agreement provides that the Debtor had fifteen days to cure any monetary default after receiving notice thereof from the Lender.  See Loan Agreement, at §10.1(u).

40.     These monetary defaults need not be cured by the Debtor itself.  Under Section 12(b) of the Intercreditor Agreement, the Mezz Lender is entitled to cure the Debtor's monetary default within seven (7) days after "the later of (i) the receipt by it from [Lender] of the [default] and (ii) the expiration of Debtor's cure period, if any." See Intercreditor Agreement, at § Section 12(b).

41.     Similarly, Section 12(c) of the Intercreditor Agreement established a means by which the Mezz Lender could cure the Debtor's non-monetary defaults.

42.     In either case, for the benefit of both the Debtor and the Mezz Lender, the cure rights were only meaningful because the Lender was expressly required under Section 12(a) of the Intercreditor Agreement to notify the Mezz Lender of monetary and nonmonetary defaults in advance of accelerating the debt under the Loan Agreement or otherwise exercising remedies.

Likewise, in the event of a maturity date payment default, the Mezz Lender had a right to buy out the debt owed to the Lender.

43.     Significantly, the Intercreditor Agreement also contains the strongest possible cure right—a purchase option, pursuant to which the Mezz Lender was entitled to pay off and acquire the Loan from the Lender in exchange for payment of certain amounts owed "excluding any yield or spread maintenance premiums, prepayment fees or premiums that would be due if Borrower was prepaying the Senior Loan at the time of such purchase in violation of the prohibition against defeasance or voluntary prepayment, as applicable, and exit fees, any liquidated damage amount, any spread maintenance charges, any late charges or any default interest[.]"   Intercreditor Agreement § 14(a).

## C.     <u>Performance Under the Loan Documents and Completion of the Hotel</u>

44.     Upon the closing of the loan transactions in December 2017, as agreed by the parties in Section 7.8 of the Loan Agreement, the Debtor delivered $1,651,000.00 to Lender, to be placed in a Business Plan Reserve Account, to ensure adequate funding for the Debtor's Completion of the Business Plan Work.

45.     The Debtor likewise funded $2,400,000 into the Interest Reserve Account, as required by Section 7.9 of the Loan Agreement.

46.     Thereafter, work continued on the Hotel, and the Debtor progressed towards completion of all construction necessary for the Hotel to be open and fully operational, consistent with the requirements of the Loan Agreement.

47.     On March 22, 2018, the Debtor submitted its first Business Plan Reserve Account draw request in compliance with the Loan Agreement, based on the construction that had been completed since the Loan Agreement was executed.  After an inspection on March 27, 2018 by CBRE, a third-party engineer that conducted the onsite inspections at the Hotel, the Lender

released the requested funds from the Business Plan Reserve Account to the Debtor on June 1, 2018.

48.     On May 23, 2018, the Debtor submitted its second Business Plan Reserve Account draw request, based on additional work that had been completed on the Hotel.  The Lender released the requested funds from the Business Plan Reserve Account to the Debtor on June 14, 2018.

49.     As of May 31, 2018, the Debtor had substantially completed the Business Plan Work and satisfied the Operating Condition, as all guest room floors and the rooftop bars were substantially completed.  However, the Lender claimed that the Debtor had not yet satisfied the Operating Condition as of that date.  Accordingly, the Lender increased the Debtor's interest rate under the Loan Agreement by 0.5%.  The Debtor did not yet realize the extent of the Lender's scheme to claim that the Hotel was not finished and use that as a basis to improperly claim defaults, and so the Debtor agreed to pay the increase in order to try to maintain a good working relationship with the Lender.

50.     On June 20, 2018, the Debtor submitted its third Business Plan Reserve Account draw request which reflected the substantial completion of the Critical Hotel Features and the satisfaction of the Operating Condition.  Specifically:

    a.   The Hotel was open for business and operating with all bars and amenities;

    b.   All guestroom floors were open and operational;

    c.   The pool, ballroom space, and all conference spaces were fully operational; and

    d.   The Hotel's food and beverage outlets were open and operational (including the Hotel's rooftop bar, which is central to the Lender's allegations of noncompliance with the Loan Agreement).

13

51.     A report prepared and issued by CBRE to the Lender confirmed the Hotel's substantial completion, including the completion of all Critical Hotel Features, as demonstrated by documents, photos, and other information provided to the Lender that set forth the operability of the Hotel.

52.     At the same time, the Debtor notified the Lender that it had satisfied the Operating Condition, thereby terminating the 0.5% interest rate increase, but the Lender continued insisting that the Operating Condition had not been met despite all evidence to the contrary.

53.     Although the Lender released the third set of requested funds from the Business Plan Reserve Account to the Debtor, notwithstanding the CBRE report and the Debtor's notification to the Lender that the Operating Condition had been satisfied, the Lender refused to terminate the interest rate increase, resulting in the accrual of additional interest averaging $29,000 per month.

54.     Despite the Lender's disregard of the plain terms of the Loan Agreement, the Debtor continued paying interest at the inflated rate and funding the correspondingly increased minimum balance of the Interest Reserve Account, in an effort to maintain uninterrupted operations and a working relationship with the Lender.

55.     In August 2018, the Debtor again asserted that the increased interest rate was improper, however, it continued to fund the interest reserve requirements under the Loan Agreement at the higher rate, notwithstanding its compliance with the Loan Agreement, as it was continuing to try to work with the Lender in good faith, unaware of the Lender's intent to default the Loan and then foreclose on and obtain ownership of the Hotel.

56.     Again, wanting to continue progress on the Hotel project, maintain uninterrupted operations and potentially maintain a working relationship with the Lender in hopes of, among

other things, refinancing or extending the terms of the Loan Agreement, the Debtor complied with the Lender's demand for increasing the interest reserve at the higher interest rate despite its disagreement that such Interest Rate Increase was allowed under the Loan Agreement.

57.     After the completion of additional ancillary components of the Hotel (with the Hotel already fully operational), on September 14, 2018, the Debtor submitted a request to the Lender for a further onsite inspection to confirm the completion benchmark and to allow for reversal of the increased interest rate and the release of the remaining reserve funds.

58.     On September 17, 2018, the Debtor submitted a fourth draw request on the Business Plan Reserve Account for the additional ancillary Hotel construction that had been completed since the prior June draw request.  This draw request included photographs of the Hotel's completed roof and rooftop bar, further demonstrating that the Operating Condition had been satisfied.  At this time, the only work remaining on the Hotel was superficial, such as certain kitchen walls needing a coat of paint, and tilework needing completion in certain bathrooms.  However, the Lender continued insisting that substantial completion of the Hotel had not yet been achieved, despite all evidence to the contrary, so that the Lender could use its assertion of incompleteness to trigger an Event of Default as of the December 2018 completion deadline.

59.     Nevertheless, on September 21, 2018, following discussions between the Debtor and the Lender, the Lender relented (to a limited extent) and approved the draw request for funding the Debtor's interest reserve, which was necessary because the Debtor's operating cash flows were just beginning to ramp up and the Debtor was therefore unable to afford the inflated interest amounts improperly charged by the Lender.

D.     **The Lender's Predatory Contrived Defaults**

60.     The Lender continued withdrawing funds from the Interest Reserve Account to improperly pay itself the inflated interest rate.  Between July 2018 and December 2018, the Lender

pocketed approximately $173,777.78 of unauthorized additional interest from the Debtor, based on Lender's refusal to acknowledge that the Operating Condition was satisfied.

61.     In November 2018, the Debtor contacted the Lender and its advisors to schedule a final onsite visit to confirm that the Hotel had met final substantial completion (and met the Completion Date under the Loan Agreement) and to facilitate Lender's release of $300,000 from the Business Plan Reserve Account to reimburse the Debtor for funds it had already paid for construction on the Hotel.  The Debtor's intent was to use these funds, among other purposes, to cover debt service due December 7, 2018 under the Loan Agreement.

62.     Prior site visits had taken approximately 2-3 days to schedule, however the Lender did not schedule this visit until nearly two weeks later, for December 11, 2018, which the Lender knew was just days after the scheduled December 7 interest payment date under the Loan Agreement.

63.     On information and belief, this delay was a deliberate and predatory effort to fabricate a default by withholding the Debtor's own funds from it thereby preventing it from timely making its required interest payments to the Lender.

64.     Instead of releasing funds to the Debtor in response to the Debtor's draw request, the Lender attempted to extort a "confession" from the Debtor and demanded that, in exchange for releasing funds to the Debtor, the Debtor falsely "acknowledge" that: (a) the substantial completion of construction and the related conditions under the Loan Agreement had not been satisfied, even though the Hotel (including all of its venues) was plainly fully operational, and (b) as such, the Lender was entitled to the increased interest rate.

65.     In addition, the Lender was in essence announcing to Debtor that it was intending on claiming falsely the Debtor was in default either way. Lender was attempting to improperly

16

coerce a confession from Debtor that the construction was not substantially complete (which was belied by the facts) in return for a $300k funding release, as such a confession would have put the Debtor in default automatically by December 31, 2018 by the nature of such coerced confession, as lack of completion was an automatic default by December 31, 2018; or the Lender would refuse to release the money without any reason, and thereby call a default for lack of interest payment. Because the Debtor refused to make these statements (which it believed to be false), the Lender would not release the funds that the Debtor was entitled to and the Debtor was ultimately unable to make the December 2018 interest payment.

66.     As it became apparent to the Debtor that the Lender was intent on contriving defaults so that the Lender could proceed with a foreclosure action, as set forth above, the Debtor began soliciting other lenders for a complete refinancing of the debt to the Lender.

67.     On December 10, 2018, the Debtor provided the Lender a term sheet from Natixis Bank setting forth the terms of a transaction that would have paid off the debt to the Lender in full.

68.     However, it became more and more clear that the Lender was not content with merely being paid off—it wanted to obtain ownership of the completed Hotel, along with the benefits of the increased value of the property.  Despite its receipt of the refinancing term sheet the same day and its knowledge that a site visit would be the next day (which would have conclusively established the Completion of the Business Plan Work and necessitated the release of funds from the Business Plan Reserve Account to satisfy the Debtor's December interest obligations), on Monday December 10, 2018, the Lender sent the Debtor a notice of default (the "December Default Notice") based on (1) the Debtor's purported failure to make the December interest payment the preceding Friday (due to the Lender's improper retention of funds in the Business Plan Reserve Account) and (2) the Debtor's failure to fund $581,323.33 in additional

amounts that were purportedly required to be deposited into the Interest Reserve Account on November 28.

69.     In other words, despite the fact that the Lender was obligated under the Loan Agreement to release the Debtor's funds from the Business Plan Reserve Account for the payment of interest (among other things) and agree that the interest rate increase was no longer applicable, the Lender nevertheless called a default with the goal of triggering a cascade of adverse consequences for the Debtor.

**E.     Attempts to Cure False Defaults**

70.     Upon seeing this series of contrived and false defaults by the Lender, Mezz Lender attempted to step in, and assist as was its right. As part of its attempt to stabilize the situation, enable the Debtor to cease being in default and to assist Debtor in obtaining a refinance to pay off the Lender and move on to stabilize the property, the Mezz Lender stepped in to make interest payments and to cure the so called defaults. But this was to no avail, as Lender simply took the funds from the Mezz Lender, to the tune of about $3,000,000 as detailed below, and then Lender continued claiming that the loan was still in default, without any explanation.

71.     In particular, in light of the alleged outstanding defaults, the Mezz Lender made nearly $1 million in payments to the Lender as a "protective advance" pursuant to its cure rights under the Intercreditor Agreement, and the Debtor also paid $240,000 pursuant to its cure rights under the Loan Agreement, with the amounts paid to the Lender in January 2019 totaling $1,239,365.45.

72.     The Debtor understood based on communications in writing from the Lender, including invoices, that the nearly $1.24 million in payments were sufficient to cure all outstanding monetary defaults, including those identified in the December Default Notice.

73.     On January 7, 2019, the Debtor requested a payoff letter from the Lender, and on January 8, 2019 the Debtor requested that the Lender fund the previously approved construction draw in the approximate amount of $270,000.00.

74.     In response, Lender maintained that the Debtor was still in default—notwithstanding the Debtor's cure payment in response to the December Default Notice—based on the Debtor's alleged failure to properly fund the interest reserve and outstanding expenses, provide financial information, and satisfy the completion of its obligations under the Loan Agreement. All of these conditions had been fulfilled at the time, however, as the Mezz Lender had just paid nearly $1 million to cure the so-called default, and the construction was completed and all rooms and venues were fully operational.

75.     Further, based on a report issued by CBRE, the Debtor rightfully maintained that Lender's claims were false as it had met substantial completion of the Hotel under the terms of the Loan Agreement, and that all that remained in the construction reserve account was about $76,000 worth of minor work to complete (not just "substantially" complete) the multi-million dollar Hotel. As such, even according to Lender's own records, completion had occurred as defined in the loan documents and there was no default.

76.     Shortly thereafter, on January 9, 2019, the Debtor received an invoice from the Lender, which improperly asserted additional amounts owing on the Loan based on: (i) the 0.5% increase to the interest rate relating to the Operating Condition; (ii) an additional 5% *per annum* of interest at the default rate purportedly based on the December Default Notice; and (iii) late fees totaling approximately $373,000.00.[3]

---

[3] Among the asserted amounts was $94,000 in default interest. However, at the time such amounts were asserted, the Debtor was entitled to a credit of $173,777.78 on account of the improperly charged interest, which would have completely covered the default interest even if default interest was properly charged. Moreover, at the time, the Debtor

77.     Nevertheless, the Debtor paid $682,999.34 of the amount invoiced on January 9, 2019.

78.     Then, on January 28, 2019, despite the fact that the Debtor and Lender had just paid nearly $2 million to cure all existing monetary defaults, the Debtor and the Mezz Lender received a second default notice based upon Lender's failure to replenish the Interest Reserve Account (together with a small amount of unpaid expenses purportedly incurred by the Lender).  The letter demanded an amount of $712,358.08 to cure the default.

79.     On February 5, 2019, Mezz Lender timely paid the $712,358.08 cure amount to Lender via wire transfer.  This payment cured all pending monetary defaults in their entirety.

80.     Despite the cure payments, the Lender again sent a notice to the Debtor demanding payment of $634,695.45 into the Interest Reserve Account, which amount again accounted for excessive default and non-default inflated interest.  On March 1, 2019, the Mezz Lender received a third default letter for the Debtors failure to replenish the Interest Reserve Account. The letter demanded an amount of $634,695.45 to cure the default, despite the fact that there was no default..

81.     On March 11, 2019, the Mezz Lender timely paid the $634,695.45 cure amount to Lender via wire transfer, which, once again, was a sufficient amount to cure all alleged monetary defaults that were communicated to the Debtor, despite the fact that Lender had no basis for claiming there was a default..

82.     Finally, on March 28, 2019, the Mezz Lender received a fourth default letter based upon the Debtor's failure to replenish the Interest Reserve Account. The letter demanded an

---

had well over $94,000 just sitting in the Interest Reserve Account. All Lender had to do was merely apply the Debtor's own money from the Interest Reserve Account to cure the payment default. In light of the prior cure made by the Debtor and the Mezz Lender, it was unclear why any default interest could have accrued and, on information and belief, the Lender intentionally failed to disclose its position that $94,000.00 of default interest was owed—despite the numerous communications between the Lender and the Debtor regarding the alleged default—in order to increase the Debtor's costs of remaining in compliance with the Loan Agreement and ultimately trigger additional defaults.

amount of $671,350.97 to cure the default. This again happened despite the fact that there was no

basis for claiming there was a default, and Lender refused to provide an explanation as to how and

why it took the position that there was a default.

83.    On April 5, 2019, Mezz Lender timely paid the $671,350.97 cure amount to Lender

via wire transfer.  This payment, too, cured all existing monetary defaults in their entirety.

84.    Despite the four cure payments from the Mezz Lender (all of which included default

interest plus interest inappropriately calculated at the inflated rate 0.5% higher than the contractual

rate as if the Hotel's construction were not substantially complete), the Lender continued to

maintain that the Debtor was in default under the Loan Agreement without any explanation as to

how this was possible after all of the foregoing cure payments were made..

85.    On June 3, 2019, the Debtor and the Lender entered into negotiations to facilitate

the Debtor's refinancing of the Loan.

86.    On June 5, 2019, the Debtor received a payoff letter from the Lender good through

June 7, 2019.

87.    Despite the Debtor's and Lender's progression towards resolution and payment of

the amounts due and owing under the Loan, on June 7, 2019, the Debtor unexpectedly received

another sham default letter from Lender, this time for alleged failure to repay the Loan by the

Initial Maturity Date (the "Maturity Default Notice").

88.    The foregoing was  a sham default, as the Lender had been paid over the previous

6 months the exceptional amount of about $3 million that cured any and all monetary defaults. For

clarity, the monthly payment was about $300,000, and, consequently, over the period of 6 months

the Mezz lender has paid double than the amount of the interest due, about $3 million, all in order

to cure all the fabricated defaults claimed falsely by the Lender.

89.    But all this was to no avail. Lender took the funds, but continued insisting inexplicably that there was a default, which was patently false. Similarly, the completion conditions of the construction had indisputably been done and completed by December 2018 despite the Lenders false claims to the contrary.

90.    Due to Lender's sequential, contrived and overlapping default notices, the Debtor was never given the ability to exercise its option under the Loan Agreement to extend the Maturity Date prior to receiving the June 7, 2019 default letter.

91.    Likewise, the Lender's refusal to provide any explanation for its improper default notices, nor any notice or explanation to the Debtor or Mezz Lender of all known monetary and nonmonetary defaults, to the extent any such defaults existed, deprived the Debtor of the ability to protect its rights, or for the Mezz Lender to protect both its own interest and the Debtor's.

**F.    Lender's Interference With Efforts to Refinance or Sell**

92.    Lender through, amongst other things, its continuing (and improper) notices of default deliberately attempted to prevent Debtor from finding alternate lenders to provide an exit and refinance from Lender, as Lender was intent on ultimately taking the property from the Debtor. Because lenders that offer the most competitive financing and the lowest rates generally cannot lend into defaulted situations, Lender's contrived defaults made refinancing all the more difficult and expensive to achieve.

93.    As a result of Lender's continued bad faith and breaches of various provisions of the Loan Documents, the Debtor sought and obtained a term sheet—the Natixis term sheet discussed above—to refinance with a new lender at a lower interest rate than the debt to the Lender.

94.    Upon the Lender declaring the Loan in default, however, Natixis advised that it could not refinance the Loan because it could not lend money to a borrower that had a default under its loan terms.

95.     Nevertheless, the Debtor continued its efforts to obtain refinancing.

96.     However, the terms available to the Debtor because of Lender's wrongful actions set forth above, including in continuously declaring sham defaults and insisting that the Loan remains in default, for any potential refinancing were materially worse than the refinance terms the Debtor was offered prior to Lender improperly declaring a default and claiming that the Loan had matured.

97.     On information and belief, the Lender's goal in pursuing the foregoing course of conduct was to manufacture defaults under the Loan Agreement, initiate foreclosure proceedings with respect to the Hotel, and obtain the fully operational Hotel for a steep discount at a foreclosure sale.

98.     Further evidence of the Lender's bad faith can be found in its dealings with the Debtor's principals with respect to a different project in Brooklyn.

99.     The Loan to the Debtor was in fact the second loan that Lender had provided to support projects managed by the Debtor's principals.  The first such loan was on a 200-unit residential project at 564 St. Johns Place, in the Park Slope neighborhood of Brooklyn.  That loan was provided a few months prior to the Loan for the Hotel.

100.     In hindsight, it appears that that the Lender's making of the Loan for the Hotel was done in part so that the Lender could pressure the Debtor's principals on multiple fronts.  Indeed, immediately upon closing on the Loan, the Lender also began falsely claiming the existence of defaults with respect to the St. Johns project, also without sufficient explanation as to the basis for such defaults.  The Lender then communicated to the Debtor's principals that it intended to exercise all remedies with respect to both loans.

101.   This campaign of misconduct culminated in an "offer" from the Lender on the following terms:  First, the Debtor's principals would sell the St. Johns property to the Lender for a steep discount (only about 1/3 of the fair market value of the property and 1/2 the outstanding balance of the related debt).  Second, the property would be leased back from the Lender on onerous terms.  Third, most of the minimal proceeds from the "sale" would be applied to St. Johns loan, while the balance would be put towards the Loan, including the Interest Reserve Account.

102.   In essence, this predatory "offer" on behalf of the Lender attempted to bully Debtor into detrimental terms and changes on the Hotel loan, by claiming falsely that St Johns and the Hotel were both in default and threatening to foreclose on both properties – within 3 months of the closing of the Hotel loan. There was no possibility of the Hotel being in default within 3 months of the closing of the loan, as no conditions had to be met at that point in time. The offer from the Lender  started with the sentence "Benefit Street will be exercising all remedies for the defaults on both loans", which shows that the Lender  used the threat of trumped up defaults as a tool to attempt to bully the Debtor's principles to give up their ownership of the 564 St Johns asset by threatening to falsely call defaults on the Hotel.

103.   The foregoing offer was plainly unacceptable and an attempt to bully the Debtor's principals into submission.  Nevertheless, the Debtor's principals managed to refinance the debt on the St. Johns property and then sell the property for much closer to fair market value (although the terms of the refinancing and sale were not as favorable as they would have been but for the Lender's misconduct).  The Debtor, on the other hand, was less fortunate, and was not able to escape from the Lender's grasp on market terms.

### G.      The Filing of the Foreclosure Action

104.     On June 11, 2019, just four days after the Debtor received the Maturity Default

Notice, the Lender commenced a foreclosure action in the Supreme Court of the State of New

York, New York County, Index No. 653396/2019 (the "Foreclosure Action").

105.     The complaint in the Foreclosure Action alleged, among other things, the Debtor's

purported default for: (i) failure to pay the principal and interest when due as of the Initial Maturity

Date; (ii) failure to make payments for debt service or fund reserve amounts, which were noted in

the December Default Notice; and (iii) allowing the existence of certain mechanic's liens filed

against the Hotel.

106.     Simultaneously with the filing of the Foreclosure Action, the Lender filed an *ex*

*parte* motion for the appointment of a receiver, which the state court approved on October 18,

2019.  Constantino Sagonas (the "Receiver") was eventually appointed as receiver for the Hotel

on February 21, 2020.

107.     The Debtor filed its answer, affirmative defenses, and counterclaims on August 30,

2019 in the Foreclosure Action.

108.     On February 6, 2020, the Lender filed a motion for summary judgement, which the

State Court substantially denied on April 9, 2020.

109.     In denying summary judgment, the state court held that there were triable issues of

fact regarding whether there were indeed outstanding defaults arising from the alleged failure to

timely complete the required elements of the Hotel and the Debtor's failure to pay increased

interest as a result.[4]  In its order denying the Lender's motion, the state court also declined to

dismiss or sever the Debtor's counterclaim for breach of contract arising from the Lender's refusal

---

[4] A copy of the Supreme Court's order denying summary judgment is attached hereto as **Exhibit F**.

to accept certain payments and give the Debtor all payments due, by continuing to charge default interest, and by improperly preventing the Debtor from extending the maturity date of the Loan.

110.    The state court also denied dismissal of a significant number of the Debtor's affirmative defenses and counterclaims, and allowed the Debtor's claims for lender liability against the Lender to move forward.

111.    The Lender lodged an interlocutory appeal of the denial of its summary judgment motion with the Supreme Court of the State of New York, Appellate Division, First Department (the "First Department").

112.    On February 16, 2021, following briefing and oral argument, the First Department summarily reversed the trial court's denial of summary judgment.

113.    The entirety of the First Department's substantive ruling is as follows:

> Plaintiff established prima facie entitlement to summary judgment by producing the mortgage, note, and guaranty executed by defendants, and evidence of defendants' default on their obligations thereunder, including their failure to timely pay the principal balance of the loan.  Defendants failed to rebut that evidence, and they waived their affirmative defenses and counterclaims.  The record does not support defendants' contention that the waiver of defenses provision was rendered ineffective because the lender caused or contributed to the loan default.  In any event, the defenses and counterclaims were not viable.

*Benefit St. Partners Operating P'ship, L.P. v. 96 Wythe Acquisition LLC*, 191 A.D.3d 520, 138 N.Y.S.3d 348 (2021) (citations omitted).

## H.    No Waiver of Affirmative and/or Future Claims

114.    As was made clear in the underlying transaction documents and the Lender's briefing, however, it is not the counterclaims themselves that were waived, but the right to assert them in a proceeding brought by the Lender, which is completely irrelevant to the Debtor's assertion of affirmative claims in this Chapter 11 Case.  Loan Agreement § 14.9 ("Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or

proceeding brought against it by the Lender or its agents.); Mortgage § 10.4 ("To the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Loan Agreement, the Note, any of the other Loan Documents, or the Obligations."); Brief for Plaintiff-Appellant, *Benefit St. Partners Operating P'ship, L.P. v. 96 Wythe Acquisition LLC*, 2020 WL 8371161 at *41 (N.Y.A.D. 1 Dept.) ("Respondents also waived their right to interpose non-compulsory counterclaims in the first place[.]"). Further, no waiver of direct claims can be operative with respect to future claims that were not in existence at the time of the signing of the Loan Agreement.

115.    Shortly after the First Department's reversal of the trial court's denial of summary judgment, proceedings resumed in the trial court. With the First Department effectively entering judgment allowing the Lender to proceed with a foreclosure sale, the parties began the process of obtaining appointment of a special referee for the purpose of determining the amount the Debtor owed to the Lender and for conducting a foreclosure sale.

116.    As a direct consequence of the First Department's reversal, and the forthcoming foreclosure sale of the Hotel, amongst other things, the Debtor was forced to file this Chapter 11 Case to protect its investment in the Hotel, to provide for continued operation of the Hotel in the ordinary course of business, and to ensure that creditors other than the Lender would have the opportunity to be made whole (which would not have been the case were the foreclosure sale allowed to proceed). The Chapter 11 filing stayed the underlying foreclosure action.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

117.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 116 as if set forth fully herein.

118.    The Loan Agreement and the other Loan Documents constitute valid, binding, and enforceable contracts between the Debtor and the Lender.

119.    From and after no later than July 1, 2018, the Lender improperly caused an additional 0.5% *per annum* in interest to be charged on the Loan, deducted such amounts from the Interest Reserve Account, and accounted for such amounts in computing the minimum amount required to be on deposit in the Interest Reserve Account, and otherwise erroneously asserted the existence of defaults under the Loan Documents, which improperly created a compounding liability for the Debtor.

120.    Such actions constituted material breaches of the Loan Agreement.

121.    Because of the foregoing breaches, and resulting strains on the Debtor's liquidity, the Debtor's ability to satisfy the conditions necessary for the first and second Extension Options under the Loan Agreement and otherwise protect its rights under the Loan Agreement was materially impaired.

122.    The Debtor was harmed by such breaches in many ways, including but not limited to the accrual and payment of additional amounts of interest in excess of the Lender's entitlement under the Loan Agreement, the Lender's improper imposition of the default rate of interest under the Loan Agreement, the Debtor's inability to secure a refinancing of the debt to the Lender, the necessity of defending against the commencement of the Foreclosure Action, the appointment of the Receiver, and the filing of this Chapter 11 Case.

123.    By reason of the foregoing, in accordance with New York common law, the Debtor is entitled to entry of an Order and Judgment against Lender, for the benefit of the Debtor's estate, in an amount as yet undetermined, but in no event believed to be less than $20,000,000.00, plus

prejudgment interest, attorneys' fees and costs, and such other amount as may be determined by the Court.

## SECOND CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

124.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 123 as if set forth fully herein.

125.     By operation of New York common law, the implied covenant of good faith and fair dealing applies to the Loan Agreement and the other Loan Documents.

126.     The implied covenant of good faith and fair dealing required that the Lender not deprive the Debtor of the benefit of its bargain under the Loan Documents.

127.     As set forth above, the Lender deprived the Debtor of the benefit of its bargain by, among other things (i) contriving defaults against the Debtor, (ii) refusing to adequately communicate to the Debtor and Mezz Lender amounts necessary to cure monetary defaults under the Loan Agreement, (iii) refusing to fully recognize cure payments made by the Debtor and Mezz Lender, (iv) failing to communicate the existence of known nonmonetary defaults to the Debtor and Mezz Lender and (v) otherwise acting in a manner that prevented the Debtor from exercising its Extension Options under the Loan Agreement, refinancing its debt to the Lender, or otherwise improving the capital structure of the Debtor.

128.     As a result of the Lender's breach of its implied covenant of good faith and fair dealing the Debtor was deprived of funds that otherwise should have been available to it, which had the cascading effect of triggering a series of contrived defaults under the Loan Agreement, and which also deprived the Debtor of the realistic opportunity to realize the benefits available to it under the Loan Agreement, including the ability to refinance or otherwise satisfy its obligations to the Lender

129.   By reason of the foregoing, in accordance with New York common law, the Debtor is entitled to entry of an Order and Judgment against Lender, for the benefit of the Debtor's estate, in an amount as yet undetermined, but in no event believed to be less than $20,000,000.00, plus prejudgment interest, attorneys' fees and costs, and such other amount as may be determined by the Court.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

130.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 129 as if set forth fully herein.

131.   The Lender was unjustly enriched as a result of the misconduct it perpetrated against the Debtor, in that it collected and retained funds from and on behalf of the Debtor to which it was not legally entitled.

132.   The enrichment of the Lender was at the expense of the Debtor and all of its other creditors and its direct and indirect equity holders.

133.   By reason of the foregoing, in accordance with New York common law, the Debtor is entitled to entry of an Order and Judgment against Lender, for the benefit of the Debtor's estate, in an amount as yet undetermined, but in no event believed to be less than $20,000,000.00, plus prejudgment interest, attorneys' fees and costs, and such other amount as may be determined by the Court.

### FOURTH CLAIM FOR RELIEF
### (Conversion)

134.   The Debtor repeats and re-alleges the allegations set forth in paragraphs 1 through 133 as if set forth fully herein.

135.     Pursuant to the Loan Agreement the Debtor entrusted the Lender with certain its personal property, including up to $1,651,000 deposited in the Business Plan Reserve Account and up to $2,400,000 in the Interest Reserve Account.

136.     As described in more detail above, the Lender improperly exercised dominion and control over, and interfered with the Debtor's legal and possessory rights in, the funds held in the Business Plan Reserve Account and the Interest Reserve Account by, among other things, intentionally and willfully refusing to acknowledge the Completion of the Hotel and thereby improperly withholding funds from the Business Plan Reserve Account and withdrawing excessive interest amounts from the Interest Reserve Account.

137.     As described in more detail above, the Debtor was harmed by the Lender's improper actions with respect to the Business Plan Reserve Account and the Interest Reserve Account including, but not limited to, the loss of use of the funds held in such accounts, the need to deposit unnecessary additional funds in the Interest Reserve Account (or for the Mezz Lender to do so on behalf of the Debtor), and the defaults under the Loan Agreement caused as a result of the Lender's misconduct as set forth above.

138.     By reason of the foregoing, in accordance with New York common law, the Debtor is entitled to entry of an Order and Judgment against Lender, for the benefit of the Debtor's estate, requiring the return of the property improperly used and/or controlled by the Lender, together with special, consequential, or other compensatory damages stemming therefrom, plus attorneys' fees and costs, or such other amount as may be determined by the Court.

## FIFTH CLAIM FOR RELIEF
### (Objection to Claim)

### Introduction

139.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 138 as if set forth fully herein.

### A.    The Lender's Claim

140.    On July 13, 2021, the Lender filed its proof of claim in the Debtor's bankruptcy case (the "Proof of Claim") in the amount of $89,534,755.49.

141.    Of this amount, $68 million represents the unpaid principal amount of the Loan. The Debtor does not dispute that the Lender has a valid claim with respect to the $68 million in unpaid principal in the Loan.

142.    However, the Debtor objects to the portion of the Lender's claim relating to the continued accrual of interest at excessive rates, together with the excessive attorney's fees, expenses, and other charges asserted against the Debtor.

143.    Specifically, the lender claims to be entitled to:

    a.    Interest at the contractual rate on the unpaid principal balance of the Loan through July 14, 2021 in the amount of $11,432,386.67;

    b.    $1,434,683.73 in so-called "protective advances" that are really the Lender's legal fees;

    c.    Interest paid on the so-called "protective advances" in the amount of $94,827.78;

    d.    Default interest on the foregoing amounts through July 14, 2021 in the amount of $7,299,435.65;

    e.    "Additional Interest" under the Loan Agreement in the amount of $340,000

f.   "Late Fees" in the amount of $245,556.60;

g.   Additional legal fees in the amount of $1,000,000; and

h.   Reimbursement for an STR report in the amount of $550. [Claim 8-1 p. 245]

**B.      Improper Application of Property of the Estate**

144.    The Lender claims to reduce its claim on account of a "Credit from Applied Reserves" in the amount of $303,684.94.  *Id.*

145.    On information and belief, the so-called "Credit from Applied Reserves" (which is not explained in the Lender's Proof of Claim) is, in fact, an improper application of the Debtor's cash collateral to a prepetition debt, which the Lender has been improperly holding since the Petition Date.

146.    Accordingly, Lender should be required to turn over such reserve amounts to the Debtor pursuant to Section 542 of the Bankruptcy Code, and the Lender's claim should be disallowed in its entirety pursuant to Section 502(d) of the Bankruptcy Code.

147.    Moreover, to the extent that Lender has already applied such funds to its prepetition claim against the Debtor, the Lender has violated the automatic stay set forth in Section 362 of the Bankruptcy Code, and is liable for monetary damages as a result of such actions.

**C.      Disallowance of Unsubstantiated Charges**

148.    The so-called protective advances, and interest thereon, are improperly charged to the Debtor.  The Lender's Proof of Claim does not identify the provision or provisions of the Loan Agreement pursuant to which it is entitled to such expenses.  The amount of such expenses is excessive.  Moreover, the Lender has not offered any evidentiary support for the necessity, reasonableness, or incurrence of such expenses, other than their inclusion as a single line-item on an exhibit to the Lender's Proof of Claim.  Accordingly, the $1,434,683.73 in protective advances

and $94,827.78 in interest thereupon should be disallowed for lack of legal and evidentiary support.

149.     Likewise, the $1,000,000 in "additional legal fees" (which is a suspiciously round number, and is also unexplained) should be disallowed for lack of legal and evidentiary support.

**D.     Disallowance of Unlawful and Unauthorized Fees**

150.     The late fees are separately disallowable on the basis that such amounts cannot be recovered as a matter of state law, and are barred by terms of the Loan Agreement.

151.     New York law unambiguously provides that, "[i]n the absence of a provision in the mortgage to the contrary, the collection of late fees after a mortgage note has been accelerated is impermissible." *Home Loan Inv. Bank, F.S.B. v. Goodness & Mercy, Inc.*, No. 10-CV-4677 ADS ETB, 2012 WL 1078886, at *6 (E.D.N.Y. Mar. 30, 2012) (quoting *Carreras v. Weinreb*, 33 A.D.3d 953, 955 (2d Dep't 2006)).  This rule was established based on the principle that it is "inconsistent to allow a lending institution to accelerate a note, thereby denying the debtor the right under the mortgage note to make monthly installments and to continue to insist on its own right under the note to impose monthly late charges." *Id.* (*citing Green Point Sav. Bank v. Varana*, 236 A.D.2d 443, 443 (2d Dep't 1997) (citations omitted).  Further, courts have held that a creditor cannot receive both default interest and late charges as both are "designed to compensate the lender for the same injury, and awarding both amounts to a double recovery." *In re 785 Partners LLC*, 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012).  The same rule therefore applies irrespective of whether a loan is payable in full due to maturity or acceleration upon default.

152.     The late fees cannot be assessed because Section 2.6(d) of the Loan Agreement expressly provides that such fees cannot accrue as to payments that are "due on the Maturity Date." Likewise, late fees and default interest cannot be charged on the same amounts.  Accordingly, this provides a separate and independent basis for disallowing such fees and, to the extent demonstrated

34

at trial, for providing a credit against the Lender's Claim for amounts that were previously and improperly double-charged in violation of New York law.

**E.** **Equitable Disallowance of Default Interest and Other Amounts**

153.   The nearly $7.3 million in default interest should be similarly disallowed on equitable grounds (as should, to the extent not disallowed on other grounds, the additional interest, fees, advances, attorneys' fees, and other amounts).

154.   Irrespective of the proposed equitable subordination (as described below), the Disputed Claim should be barred by this Court's independent equitable powers and under state law.

155.   Courts have made clear that a default interest rate is subject to adjustment based on equitable considerations.  *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012).  In particular, courts are empowered to modify the contract rate based on notions of equity where, among other things, a secured creditor is guilty of misconduct.  *Id*.

156.   Indeed, the granting of interest under Bankruptcy Code § 506(b) is not dictated by the loan agreement.  *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 239-40 (1980).  Instead, courts conduct a factual and equitable analysis.  *See, e.g., In re Southland Corp.*, 160 F.3d 1054, 1059-60 (5th Cir. 1998); *In re Terry Ltd. P'ship,* 27 F.3d 241, 243 (7th Cir. 1994); *see also Key Bank Nat'l Assoc. v. Milham (In re Milham),* 141 F.3d 420, 423 (2d Cir. 1998); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 338 (S.D.N.Y. 2008); *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012); *In re General Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998).

157.    Additionally, under New York law, "[a] foreclosure action is equitable in nature and triggers the equitable powers of the court." *In re Heavey*, 608 B.R. 341, 349 (Bankr. E.D.N.Y. 2019) (citation omitted).   "Accordingly, when a foreclosing party demonstrates 'wrongful conduct,' it is proper for a court to "exercise[ ] its discretion cancelling certain interest accrued on the mortgage note." *Id.* (citation omitted).  "The exercise of that discretion will be governed by the particular facts in each case, including any wrongful conduct by either party." *Dayan v. York*, 51 A.D.3d 964, 965, 859 N.Y.S.2d 673 (2008).

158.    It follows, then, that a bankruptcy court applying New York law is empowered to exercise its discretion under this exception for actions equitable in nature. *In re 114 Tenth Ave. Ass'n., Inc.*, 2011 WL 1211547, at *2 (Bankr. S.D.N.Y. 2011) ("[I]t is clear that an action for foreclosure is equitable in nature . . . . Therefore, the Court has discretion in connection with both an award of interest and the rate.").

159.    Here, such equitable considerations warrant disallowing the amount of the Lender's allowed claim that is based upon the improperly inflated interest rate, accrual of default interest, and the Lender's other fees and expenses purportedly chargeable to the Debtor.

160.    The lender's misconduct, as detailed at length above, caused the purported defaults, including the alleged maturity default where Lender's previous (and fabricated) defaults prevented the Debtor from curing monetary and nonmonetary defaults to the Lender's satisfaction, extending the Initial Maturity Date, refinancing the debt owed to the Lender, or selling its Hotel property to pay off such debt.

161.    As a result, the incurrence of the increased interest rate, default interest and related fees and expenses charged by the Lender were *the direct result of the lender's wrongdoing*.

162.    It would be highly inequitable to reward the Lender for its misconduct that was intended to stymie the Debtor's efforts to comply under the Loan Agreement and collect such exorbitant interest and fees.

163.    The application of the inflated interest and other charges would harm the unsecured creditors and constitutes a penalty.

164.    In addition, the allowance of the inflated interest and other charges would raise the level of the Lender's claim and the costs under the plan and ultimately any refinancing, and impair the Debtor's fresh start.

165.    Moreover, the Lender fully expected that it could get out of the Loan after a default without receiving any default interest.  As noted above, the Intercreditor Agreement gives the Mezz Lender the ability buy out the Loan from the Lender by paying outstanding principal and other amounts owed, but *without* the need to pay any of the penalty-like amounts charged under the Loan Agreement, including exit fees, late charges and default interest.  Intercreditor Agreement § 14(a).  Accordingly, there is no inequity in depriving the Lender of these amounts that it knew from the outset, even after a default, it could have been contractually obligated to forgo.

166.    Separately, it would be inequitable to permit the Lender to generate a windfall through the continued accrual of interest while the Debtor faced a legal and practical inability to fully operate during the initial period of the COVID-19 pandemic.  Mitigations imposed by New York City and New York State severely restricted the Debtor's ability to operate and, meanwhile, the hospitality industry as a whole practically ground to a halt.  As a result of these unprecedented circumstances, the Debtor had no practical ability to pay its debt to the Lender, whether through operations, refinancing, or otherwise, and the Debtor should therefore not be required to pay

excessive interest charges to the Lender to the detriment of the Debtor and its other creditors and stakeholders.

167.    For all of these reasons, this Court should exercise its equitable powers, and the equitable powers that exist under New York Law, to prevent the Lender from imposing any further hardship on the Debtor and its other creditors.

168.    By reason of the foregoing, the Debtor is entitled to entry of an Order allowing the Lender's secured claim in an amount not to exceed $70.7 million, as determined at trial.

### SIXTH CLAIM FOR RELIEF
### (Equitable Subordination)

169.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 168 as if set forth fully herein.

170.    Section 510(c) of the Bankruptcy Code provides that the bankruptcy court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim[.]"  11 U.S.C. § 510(c).

171.    As the Bankruptcy Code does not define these equitable principles, courts in the jurisdiction have adopted the *Mobile Steel* test for determining whether it is appropriate to subordinate all or part of a claim.

172.    Under *Mobile Steel*, this Court may exercise its power of equitable subordination when three conditions are met: (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct resulted in injury to the creditors of the Debtor or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. *In re Enron Corp.*, 333 B.R. 205, 217 (Bankr. S.D.N.Y. 2005) (citing *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir. 1977).

173.     The Lender engaged in pervasive inequitable conduct in the years leading up to this

Chapter 11 Case, as discussed above, including, but not limited to, charging excessive rates of

interest in violation of the Loan Agreement, contriving defaults against the Debtor and precluding

the Debtor from refinancing the debt owed to the Lender at a reasonable interest rate.

174.     The Lender obtained an unfair advantage as a result of such actions, in that it was

able to commence foreclosure proceedings that would have precluded any recoveries to the

Debtor's other creditors (as well as its equity holders).

175.     The Debtor's other creditors were also harmed by the Lender's inequitable conduct,

including but not limited to the fact that they have been forced to delay recoveries they would have

otherwise received in the ordinary course of business, expend costs to protect their rights in this

bankruptcy case, and bear the risk that circumstances attendant to this bankruptcy case will prevent

such creditors from being paid in full.

176.     Equitably subordinating a portion of the Lender's claim as a result of the foregoing

is not contrary to the Bankruptcy Code.

177.     Accordingly, the amount of the Lender's allowed claim that exceeds the

$68,000,000 principal balance of the loan plus $2.7 million in accrued interest at the contractual

rate, should be equitably subordinated to the claims of general unsecured creditors in this

bankruptcy case.

**WHEREFORE,** the Plaintiff demands judgment on its claims for relief against the

Defendant as follows:

(1)     On its first claim for relief, entry of an Order and Judgment against Defendant in
        an amount as yet undetermined, but in no event believed to be less than
        $20,000,000, plus interest form the Petition Date, attorneys' fees and costs, or such
        other amount as may be determined by the Court; and

(2)     On its second claim for relief, entry of an Order and Judgment against Defendant
        in an amount as yet undetermined, but in no event believed to be less than

$20,000,000, plus interest form the Petition Date, attorneys' fees and costs, or such other amount as may be determined by the Court; and

(3)     On its fourth claim for relief, entry of an Order and Judgment against Defendant in an amount as yet undetermined, but in no event believed to be less than $20,000,000, plus interest form the Petition Date, attorneys' fees and costs, or such other amount as may be determined by the Court; and

(4)     On its fourth claim for relief, entry of an Order and Judgment against Defendant in an amount as yet undetermined, but in no event believed to be less than $20,000,000, plus interest form the Petition Date, attorneys' fees and costs, or such other amount as may be determined by the Court; and

(5)     On its fifth claim for relief, entry of an Order against disallowing the Lender's claim in its entirety until such time that it returns property of the estate that it has wrongfully retained and, upon of the return of such property, allowing the Lender's secured claim in an amount not to exceed $70.7 million and disallowing the balance; and

(6)     On its sixth claim for relief, entry of an Order and Judgment against Defendant equitably subordinating the Defendant's claim against the Debtor's bankruptcy estate such that the claim shall not exceed $70.7 million, further reduced by such other amounts as may be awarded herein; and

(7)     such other, further, and different relief as this Court deems just and proper.


Dated:  January 6, 2022
     New York, New York

Respectfully submitted,

By:  */s/ Douglas E. Spelfogel*
Douglas Spelfogel
Leah Eisenberg
Dabin Chung
Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Facsimile:  (212) 506-1910
Email: dspelfogel@mayerbrown.com
     leisenberg@mayerbrown.com
     dchung@mayerbrown.com

*Co-Counsel to the Plaintiff*

*-and-*

Mark Frankel
**BACKENROTH FRANKEL &
KRINSKY, LLP**
800 Third Avenue
New York, New York  10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544
Email: mfrankel@bfklaw.com

*Co-Counsel to the Plaintiff*