# EXHIBIT 8

FILED: APPELLATE DIVISION - 1ST DEPT 01/04/2021 02:57 PM

NYSCEF DOC. NO. 18

2020-03532

RECEIVED NYSCEF: 01/04/2021

*To be Argued by:*
Ethan A. Kobre
*(Time Requested: 15 Minutes)*

# New York Supreme Court

## Appellate Division—First Department

---

BENEFIT STREET PARTNERS OPERATING PARTNERSHIP, L.P.,

*Plaintiff-Appellant,*

– against –

96 WYTHE ACQUISITION LLC, TOBY MOSKOVITS
and YECHIEL MICHAEL LICHTENSTEIN,

*Defendants-Respondents,*

– and –

RENT A UNIT NY INC., ADVANCED PLUMBING MECHANICAL &
SPRINKLERS CORP., MA2 FLAGS CONTRACTING CORP., ROCK GROUP
NY CORP., CRIMINAL COURT OF THE CITY OF NEW YORK, NEW YORK
STATE DEPARTMENT OF TAXATION AND FINANCE,
ENVIRONMENTAL CONTROL BOARD OF THE CITY OF NEW YORK,

*Defendants.*

**Appellate
Case No.:
2020-03532**

---

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

---

SCHWARTZ SLADKUS REICH
GREENBERG ATLAS LLP
*Attorneys for Plaintiff-Appellant*
444 Madison Avenue
New York, New York 10022
(212) 743-7000
ekobre@ssrga.com

New York County Clerk's Index No. 653396/19

# *Table of Contents*

Table of Authorities ................................................................................iv

Preliminary Statement.................................................................................1

Argument...................................................................................................3

Point I

RESPONDENTS CONCEDE THAT BORROWER HAS NOT MADE
ANY PAYMENT TO BSP IN OVER TWO YEARS—NOTHING ELSE
IS NEEDED TO MANDATE SUMMARY JUDGMENT IN BSP'S FAVOR........3

   A. Respondents Admit Borrower Failed
      To Repay The Loan By The Maturity Date......................................................3

   B. Respondents Admit Borrower Failed To Make Monthly Debt Service
      Payments—Even If The Mezzanine Lender Sought To Do So......................4

Point II

WHILE THERE IS NO NEED TO LOOK BEYOND BORROWER'S
UNDISPUTED AND UNREBUTTED PAYMENT DEFAULTS,
BORROWER ALSO DEFAULTED IN SEVERAL OTHER
RESPECTS—AND RESPONDENTS CONCEDE AS MUCH ............................7

   A. Respondents Have Not Rebutted Their Demonstrated
      Failure To Timely "Discharge of Record" The Liens ...................................7

   B. Respondents Have Not Rebutted Their Demonstrated
      Failure To Reimburse BSP's Costs And Expenses .........................................8

   C. Respondents Have Not Rebutted Their Demonstrated
      Failure To Timely Satisfy The Operating Condition .....................................8

      1. *Borrower Failed To Timely Satisfy The "Plans and Specifications"* ........8

      2. *Borrower Failed To Timely Deliver Required TCOs* ................................9

    3.  *Borrower Failed To Timely Satisfy The "Business Plan"* ........................ 10

  D.  Respondents Have Not Rebutted Their Demonstrated
     Failure To Exercise The Maturity Date Extension Option ............................ 12

Point III

RESPONDENTS FAIL TO ADDRESS—MUCH LESS STAVE OFF—
THE DISMISSAL OF THEIR REMAINING AFFIRMATIVE DEFENSES ........ 15

  A.  Respondents Concede That They Waived All Affirmative Defenses ........... 15

  B.  Respondents Have Not Staved Off Dismissal Of Their
     Standing, Waiver, Estoppel, Condition Precedent, And Set-Off Defenses .. 16

  C.  Respondents Have Not Staved Off
     Dismissal Of Their "Satisfaction" Defense ................................................. 16

  D.  Respondents Have Not Staved Off
     Dismissal Of Their "Anticipatory Breach" Defense .................................... 17

  E.  Respondents Have Not Appealed The
     Dismissal Of Their "Culpable Conduct" Defense ........................................ 20

  F.  Respondents Have Not Staved Off
     Dismissal Of Their "Bad Faith" Defense .................................................... 20

  G.  Respondents Have Not Staved Off
     Dismissal Of Their "Unclean Hands" Defense ............................................ 21

Point IV

RESPONDENTS FAIL TO ADDRESS—MUCH LESS STAVE OFF—
THE DISMISSAL OF THEIR SOLE REMAINING COUNTERCLAIM ............. 23

  A.  Respondents Concede That They Waived The Right To Counterclaim ....... 23

  B.  Respondents' Sole Remaining Counterclaim—Alleging
     "Breach" Of Contract—Fails As A Matter Of Law ..................................... 26

C. Even If Respondents' Remaining Counterclaim Could Survive
Dismissal, It Should Have Been Severed So BSP Could Foreclosure..........28

Conclusion .....................................................................................................................29

Printing Specifications Statement .............................................................................30

## *Table of Authorities*

**Cases**                                                                    **Page(s)**

*Agility Funding, LLC v Wholey*,
  119 AD3d 1168 [3d Dept 2014] ...........................................................22

*Am. Express Equip. Fin. Corp. v Mercado*,
  34 AD3d 880 [3d Dept 2006] .............................................................20

*Bank of Smithtown v 264 W. 124 LLC*,
  105 AD3d 468 [1st Dept 2013]............................................................20

*Bronx Overall Economic Dev. Corp. v DNA Auto. Corp.*,
  127 AD3d 497 [1st Dept 2015]............................................................15

*Cassara v Wynn,*
  55 AD3d 1356 [4th Dept 2008] ...........................................................16

*Computer Possibilities Unlimited, Inc. v Mobil Oil Corp.*,
  301 AD2d 70 [1st Dept 2002], *lv den*, 100 NY2d 504 [2003] ............................19

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A.,*
*"Rabobank Intl.," NY Branch v Navarro*,
  25 NY3d 485 [2015] .......................................................................24

*Citibank, N.A. v American Banana Co., Inc.*,
  50 AD3d 593 [1st Dept 2008]............................................................22

*Citibank, N. A. v Plapinger*,
  66 NY2d 90 [1985] .........................................................................24

*CSMC 2007-C1 Oswego Rd., LLC v Kimbrook Rte. 31, LLC*,
  120 AD3d 1539 [4th Dept 2014] .........................................................28

*DiSunno Architecture v Sheppard*,
  18 AD3d 751 [2d Dept 2005] .............................................................11

*Domus Realty Corp. v 3440 Realty Co.*,
  179 Misc 749 [Sup Ct, NY Co 1943] *aff'd*, 266 AD 725 [1st Dept 1943]...........22

iv

*Excel Capital Group Corp. v 225 Ross St. Realty, Inc.*,
  165 AD3d 1233 [2d Dept 2018] ...........................................................17

*First Fed. Sav. Bank v Midura*,
  264 AD2d 407 [3d Dept 1999] ...........................................................16

*First Nat'l Stores, Inc. v Yellowstone Shopping Center, Inc.*,
  21 NY2d 630 [1968] ...........................................................................21

*First Union Mortg. Corp. v Fern*,
  298 AD2d 490 [2d Dept 2002] ...........................................................28

*Fleet Bank v Pine Knoll Corp.*,
  290 AD2d 792 [3d Dept 2002] ...........................................................28

*Graf v Hope Bldg. Corp.*,
  254 NY 1 [1930] .....................................................................21, 22, 26

*Hatton v Quad Realty Corp.*,
  100 AD2d 609 [2d Dept 1984] ...........................................................20

*Home Sav. of Am. v Isaacson*,
  240 AD2d 633 [2d Dept 1997] ...........................................................16

*In re CPG Constr. & Dev. Corp. v 415 Greenwich Fee Owner, LLC*,
  2012 NY Slip Op 33404(U) [Sup Ct, NY Co 2012]
  *aff'd*, 117 AD3d 623 [1st Dept 2014] ................................................21

*In re Republic Airways Holdings Inc.*,
  598 BR 118 [Bankr SD NY 2019]................................................23, 24

*JFURTI, LLC v Singal*,
  171 AD3d 611 [1st Dept 2019]...........................................................15

*Jo Ann Homes at Bellmore, Inc. v Dworetz*,
  25 NY2d 112 [1969] ...........................................................................21

*Joseph P. Carrara & Sons, Inc. v A.R. Mack Constr. Co., Inc.*,
  89 AD3d 1190 [3d Dept 2011] ...........................................................18

v

*JPMCC 2007-CIBC19 Bronx Apts., LLC v Fordham Fulton LLC*,
   84 AD3d 613 [1st Dept 2011]..................................................................24

*Kaplan v 2108-2116 Walton Ave. Realty Co.*,
   66 AD2d 668 [1st Dept 1978]..................................................................20

*Key Intl. Mfg. v Stillman*,
   103 AD2d 475 [2d Dept 1984],
   *aff'd as mod on other grounds*, 66 NY2d 924 [1985] ...........................21

*Landow & Landow Architects, P.C. v Shorefront Jewish Geriatric Ctr.*,
   289 AD2d 492 [2d Dept 2001] ...............................................................11

*Lelekakis v Kamamis*,
   41 AD3d 662 [2d Dept 2007] ..................................................................28

*Levkoff v Soho Grand-West Broadway, Inc.*,
   115 AD3d 536 [1st Dept 2014].................................................................22

*Marine Midland Bank, N.A. v Berley*,
   90 AD2d 646 [3d Dept 1982] ..................................................................29

*Marine Midland Bank, N.A. v Cafferty*,
   174 AD2d 932 [3d Dept 1991] ................................................................28

*Metropolitan Bank & Trust Co. v Wittich*,
   2007 NY Slip Op 33440(U) [Sup Ct, Suffolk Co 2007] ......................21

*MCC Funding LLC v Diamond Point Enters., LLC*,
   36 Misc 3d 1206(A) [Sup Ct, Kings Co 2012].....................................24

*Nastro Contracting v Agusta*,
   217 AD2d 874 [3d Dept 1995] ...............................................................20

*New York Cent. Mut. Fire Ins. Co. v Glider Oil Co., Inc.*,
   90 AD3d 1638 [4th Dept 2011] ..............................................................12

*New York Guardian Mortgagee Corp. v Olexa*,
   176 AD2d 399 [3d Dept 1991] ...............................................................26

*Norcon Power Partners v Niagara Mohawk Power Corp.*,
    92 NY2d 458 [1998] ........................................................................18

*North Fork Bank v Computerized Quality Separation Corp.*,
    62 AD3d 973 [2d Dept 2009] ...........................................................24

*Norton Co. v C-TC 9th Ave. Partnership*,
    198 AD2d 696 [2d Dept 1993] .....................................................28, 29

*O'Connor v Sleasman*,
    37 AD3d 954 [3d Dept 2007], *lv den*, 9 NY3d 806 [2007] ..................18

*Orchard Hotel, LLC v D.A.B. Group, LLC*,
    106 AD3d 628 [1st Dept 2013]....................................................17, 27

*PHH Mtge. Corp. v Davis*,
    111 AD3d 1110 [3d Dept 2013], *lv dismissed*, 23 NY3d 940 [2014] ...........21, 22

*Phillips Constr. Co. v New York*,
    61 NY2d 949 [1984] ........................................................................11

*Plaza Tower LLC v Ruth's Hospitality Group, Inc.*,
    126 AD3d 579 [1st Dept 2015]...........................................................15

*Princes Point LLC v Muss Dev. LLC*,
    30 NY3d 127 [2017] ........................................................................18

*Rebecca Broadway L.P. v Hotton*,
    143 AD3d 71 [1st Dept 2016]............................................................19

*Red Fort Capital, Inc. v Guardhouse Prods. LLC*,
    397 F Supp 3d 456 [SD NY 2019] ....................................................18

*Red Tulip, LLC v Neiva*,
    44 AD3d 204 [1st Dept 2007].....................................................2, 24, 25

*River Bank Am. v Daniel Equities Corp.*,
    213 AD2d 929 [3d Dept 1995] ..........................................................20

*Semtek Int'l Inc. v Lockheed Martin Corp.*,
   531 US 497 [2001] ................................................................................20

*Steffan v Wilensky*,
   150 AD3d 419 [1st Dept 2017].......................................................... 8, 9, 10, 15-17

*Tri-Land Props. v 115 W. 28th St. Corp.*,
   238 AD2d 206 [1st Dept 1997].......................................................28

*Trustees of Columbia Univ. v Gwathmey Siegel & Assocs. Architects*,
   167 AD2d 6 [1st Dept 1991]...............................................................11

*United Cos. Lending Corp. v Hingos*,
   283 AD2d 764 [3d Dept 2001] ...........................................................16

*Vanderbilt Mtge. & Fin. Inc. v Davis*,
   2013 NY Slip Op 32117(U) [Sup Ct, Suffolk Co 2013] .....................................21

BSP[1] respectfully submits this reply brief in further support of its appeal.

## **Preliminary Statement**

Borrower has paid nothing to BSP in over two years—not a cent—and Respondents concede as much. That one simple, undisputed, indisputable fact, above all others, entitles BSP to summary judgment. Almost nothing else matters.

Borrower last paid BSP on its $68 million Loan in December 2018. Since then, the Loan's June 2019 Maturity Date has passed, and even the hypothetical extended Maturity Date of December 2019—which Borrower could not and did not exercise—has come and gone. Borrower paid nothing. And nothing more is needed to establish BSP's absolute entitlement to summary judgment.

There is more, to be sure—much more: Borrower concedes allowing liens to rack up against the Property for hundreds of days; Borrower concedes failing to pay required costs and expenses; Borrower concedes failing to timely complete required construction. And while each of those is indeed a foreclosure-triggering default, nothing is needed beyond this undisputed, indisputable, dispositive fact: Borrower has paid nothing—not a cent—in over two years.

Respondents know all this. So rather than addressing BSP's showing, they employ an "ignore" strategy. They ignore BSP's detailed showings of Borrower's

---

[1] BSP's parent is a leading credit-focused alternative asset management firm with approximately $27 billion in assets under management. It is a wholly-owned subsidiary of Franklin Templeton, which itself holds approximately $1.5 trillion in assets under management. Capitalized terms have the meaning ascribed to them in BSP's opening brief ("Opening Brief").

many defaults. They ignore the parties' governing documents (citing almost exclusively to a self-serving affidavit rather than to the governing Loan Documents). They ignore their own contractual defense and counterclaim waivers. They ignore the many other dispositive points mandating summary judgment for BSP (*e.g.*, the insufficiency of the mezzanine lender's payments to satisfy Borrower's obligations, the insufficiency of unfiled and untimely satisfactions to discharge mechanic's liens, the legal insufficiency of their boilerplate defenses and counterclaims). And in those rare instances when Respondents at least pay lip service to BSP's showings, they just parrot (word-for-word) their papers below,[2] failing to rebut BSP's inescapable showing on appeal. But that strategy can't work.

So Respondents do what foreclosure defendants so often do: throw every conceivable irrelevant argument against the wall and hope something sticks. And while Respondents' distractions are addressed and disposed of conclusively below, they remain distractions and should be considered such. On the established law and indisputable facts—above all, Borrower's admitted failure to make any payment in over two years—BSP is entitled to summary judgment.

---

[2] Respondents regurgitate their papers below so blindly that they devote two sections of their brief (Respondents' Brief at 33-35) to counterclaims the trial court already dismissed (R. 11-12) and which was not appealed. They even purport (pg. 30) to "distinguish" a case (*Red Tulip, LLC v Neiva*, 44 AD3d 204 [1st Dept 2007]) not cited by BSP in its Opening Brief.

2

## <u>Argument</u>

### Point I

### **RESPONDENTS CONCEDE THAT BORROWER HAS NOT MADE ANY PAYMENT TO BSP IN OVER TWO YEARS—NOTHING ELSE IS NEEDED TO MANDATE SUMMARY JUDGMENT IN BSP'S FAVOR**

If only all mortgage foreclosure cases were this open-and-shut.

Borrower has paid nothing—not a cent—to BSP since December 2018, over two years ago. Borrower has blown through its June 2019 Maturity Date deadline to repay the Loan's $68 million principal (with all accrued interest and fees) and Monthly Debt Service Payments. Respondents concede as much, and nothing more is needed—or even relevant—to award summary judgment in BSP's favor.

#### **A. Respondents Admit Borrower Failed To Repay The Loan By The Maturity Date**

BSP established its absolute entitlement to summary judgment based on indisputable facts conceded by Respondents: BSP loaned $68 million to Borrower; the Loan's Maturity Date was June 9, 2019; Borrower has paid nothing (no principal, no interest, no required costs and fees) since December 2018—including not a cent at the Maturity Date (Opening Brief at 10-13). Respondents offer no coherent opposition because there is none. That could and should end the analysis.

But consistent with their goal of distraction—because they have nothing more—Respondents conclude, without support or explanation, that BSP "breached" the Loan Agreement, "prevented" Borrower from performing or

3

obtaining a Maturity Date extension, and acted in "bad faith," excusing Borrower's defaults. Those phony arguments, which just parrot their arguments below, confused the trial court into concluding that there were fact issues. But as BSP established before (Opening Brief at 25-33) and debunks again now, there are no issues of fact that could possibly preclude summary judgment in BSP's favor.

Respondents have held BSP's monies—$68 million in principal (before overdue contractual and default interest and other overdue fees)—for more than two years without paying a cent. Respondents are no victims; BSP, and its thousands of shareholders, are the victims here. It's time for Respondents' joyride with BSP's $68 million Loan to end.

## B. Respondents Admit Borrower Failed To Make Monthly Debt Service Payments—Even If The Mezzanine Lender Sought To Do So

Borrower's failure to pay to BSP any monies in over two years since December 2018 also constituted another unmistakable default: its failure to make Monthly Debt Service Payments when due (Opening Brief at 13). Respondents now claim that payments from Borrower's mezzanine lender were not credited to "cure" Borrower's defaults (Respondents' Brief at 23, 27, 32). But even the mezzanine lender's (few) payments could not and did not expunge Borrower's defaults—and, more to the point, they were necessarily inadequate.

The Loan Agreement required Borrower—no other party—to make Monthly Debt Service Payments (R. 1463 [§2.6(b)]), and it provided that Borrower's failure

to do so was an Event of Default triggering foreclosure (R. 1432 [§10.1(a)]). The mezzanine lender was not party to the Loan Agreement, and Borrower was not a party to the Intercreditor Agreement between BSP and the mezzanine lender (R. 1652-1702). The mezzanine lender's payments thus protected only its own collateral in the Property—they could not and did not relieve Borrower of its Loan Agreement obligations (R. 1555 [Loan Agreement §17.3], 1693, 1695 [Intercreditor Agreement §18(d), §(l)]) or expunge Borrower's defaults.

And even if the mezzanine lender's payments could purge Borrower's defaults in theory, its payments fell well-short of Borrower's Monthly Debt Service Payment obligations. Because the mezzanine lender did not have to pay Borrower's late charges or default interest (R. 1684-1685 [§12(b) [it agreed to pay only "amounts then due under the Senior Loan Documents…excluding any late charges, late fees or default interest"]]), the outstanding late charges and default interest incurred by Borrower were never paid at all (R. 2138-2139, 2185-2191). And, at bottom, Respondents concede that the mezzanine lender made no Monthly Debt Service Payments after April 5, 2019 (R. 2191 [¶¶63-64]). So even crediting the mezzanine lender's payments, Borrower still defaulted.

Recognizing that even the mezzanine lender's payments ceased with May and June 2019 Monthly Debt Service unpaid, Borrower claims that an Interest Reserve Account covered its shortfall (R. 1519 [Loan Agreement §7.9]). But that

account held only two months of pure Debt Service (R. 1519 [Loan Agreement §7.9])—straight interest on the Loan (R. 1437 ["Debt Service"])—excluding required monthly Taxes and Insurance Premium payments that were part of Monthly Debt Service Payments (R. 1512-1513 [Loan Agreement §7.2]). So, again, even crediting the mezzanine lender's payments, and even after disbursements from the Interest Reserve Account to pay May 2019 Debt Service with Taxes and Insurance Premiums (Loan Agreement §7.9 [R. 1519]), the remaining Interest Reserve Account funds necessarily could not pay June 2019 Debt Service, Taxes, and Insurance Premiums (R. 1839). Borrower defaulted.

*     *     *

This is as straightforward as foreclosures come. Borrower has paid nothing in over two years. In that time, Monthly Debt Service Payments have come due; the Maturity Date payment has come due; even the extended Maturity Date has passed. And still no payment from Borrower. The analysis could and should end there: BSP is entitled to summary judgment.

**Point II**

**WHILE THERE IS NO NEED TO LOOK BEYOND
BORROWER'S UNDISPUTED AND UNREBUTTED PAYMENT
DEFAULTS, BORROWER ALSO DEFAULTED IN SEVERAL
OTHER RESPECTS—AND RESPONDENTS CONCEDE AS MUCH**

In the face of Borrower's multiple, long-standing, admitted payment defaults—welching on Monthly Debt Service Payments and the Maturity Date payment—BSP need show nothing more to warrant summary judgment. But there is much more—more Borrower defaults entitling BSP to summary judgment—which Respondents fail even to address, much less rebut.

**A. Respondents Have Not Rebutted Their Demonstrated
Failure To Timely "Discharge of Record" The Liens**

As BSP established (Opening Brief at 14-15), Borrower defaulted by permitting the Property to become subject to four mechanic's liens that each "remain[ed] undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45) days" (R. 1534 [§10.1(h)]). Those liens (R. 2170, 2172, 2174-2175, 2177) remained "of record" for far longer than forty-five days—one for 541 days!—before satisfactions were even signed (R. 2169, 2171, 2173, 2176). And even the signed satisfactions were not file-stamped to show they were "discharged of record" by filing with the County Clerk's office (NY Lien Law 19[1]), as the Loan Agreement required (R. 1534 [§10.1(h)]). Respondents simply ignore Borrower's admitted failure to satisfy the 45-day lien discharge deadline—

7

just as the Decision did not address it—and have thus conceded Borrower's default

(*see e.g. Steffan v Wilensky*, 150 AD3d 419, 420 [1st Dept 2017] ["By his silence

in his opposition brief, defendant concedes, as plaintiff argues, that…"]).

## B. Respondents Have Not Rebutted Their Demonstrated Failure To Reimburse BSP's Costs And Expenses

BSP established Borrower's admitted failure to pay the costs of BSP's

Lender Consultant and associated expenses, as Borrower was obligated to do

(Opening Brief at 22-23). Respondents again fail even to address—much less

rebut—BSP's showing, thus conceding Borrower's default (*see e.g. Steffan v

Wilensky*, 150 AD3d 419, 420 [1st Dept 2017] ["By his silence in his opposition

brief, defendant concedes, as plaintiff argues, that…"]).

## C. Respondents Have Not Rebutted Their Demonstrated Failure To Timely Satisfy The Operating Condition

Respondents also have not rebutted their demonstrated and indisputable

failure to achieve the Operating Condition by December 31, 2018—yet another

default entitling BSP to summary judgment (Opening Brief at 16-22).

### 1. Borrower Failed To Timely Satisfy The "Plans and Specifications"

The Operating Condition included "Completion of the Business Plan Work"

(R. 1448 ["Operating Condition"]); the "Business Plan Work," in turn, included all

work and costs contemplated under the "Business Plan" (R. 1435 ["Business Plan

Work"]); the "Business Plan," in turn, included the "Plans and Specifications" (R.

1434 ["Business Plan"])—meaning, a failure to satisfy the Plans and Specifications was a failure to satisfy the Operating Condition. Separately, "Completion" included completion of the Business Plan Work "substantially in accordance with all Plans and Specifications" (R. 1436 ["Completion"]). So two separate provisions of the Loan Agreement—the definitions of "Business Plan" (R. 1434) and "Completion" (R. 1436)—obligated Borrower to comply with the Plans and Specifications (1974-1976).

Respondents concede failing to do so. The Plans and Specifications require a rooftop restaurant fully-enclosed by windows[3] (R. 1976) and a "RETRACTABLE AWNING" on each side (R. 1975 [emphasis in original]), so that the restaurant could operate year-round—crucial to the Business Plan. Respondents make a studied effort to omit[4] any mention of the Plans and Specifications (citing only the Business Plan), thus conceding BSP's irrefutable showing (*see e.g. Steffan v Wilensky*, 150 AD3d 419, 420 [1st Dept 2017] ["By his silence in his opposition brief, defendant concedes, as plaintiff argues, that…"]).

### 2. *Borrower Failed To Timely Deliver Required TCOs*

"Completion" also included delivery to BSP, by December 31, 2018, "of one or more temporary certificate[s] of occupancy…for all Improvements and evidence

---

[3] This wasn't some flimsy window—they were distinctive curtain windows costing $68,270—that's $17,000 more than the restaurant structure itself (R. 1973 ["Restaurant Window"]).

[4] The words "Plans and Specifications" never appear in Respondents' Brief other than in block quotes of the Loan Agreement's definitions.

that all other approvals from Governmental Authorities have been issued and all

other Legal Requirements have been satisfied so as to allow the Improvements to

be used and operated in accordance with the Loan Documents" (R. 1436; Opening

Brief at 21). The Decision never addressed Borrower's obligation to deliver the

TCOs—ignoring Borrower's admitted failure to deliver any of them (R. 2195)—

and Respondents concede this default by failing to address it on appeal (*Steffan v*

*Wilensky*, 150 AD3d 419, 420 [1st Dept 2017] ["By his silence in his opposition

brief, defendant concedes, as plaintiff argues, that…"]).

### 3.   *Borrower Failed To Timely Satisfy The "Business Plan"*

Respondents argue that the Business Plan did not require a fully-enclosed

rooftop restaurant because "it has a single line item that states, 'Rooftop Restaurant

Structure $51,000'" (Respondents' Brief at 21). But that's nonsense, because

directly above that line item is another, also under "Rooftop," for "Restaurant

Window $68,270"—a higher completion cost than, and thus separate from, the

restaurant structure itself. Indeed, the Plans and Specifications also depict a

conspicuous, distinctive curtain-window enclosure to the rooftop restaurant (R.

1976 [see curtain windows stretching the length of the restaurant]).

Respondents likewise distort the Business Plan's kitchen requirement

(Respondents' Brief at 22). The "Kitchen $250,000" line item is under the

"Ballroom" heading because the Business Plan required a dedicated ballroom

kitchen (R. 1973). Indeed, both other line items under "Ballroom" ("Mouldings," "Mezz. Staircase") are situated in and dedicated to the Ballroom (R. 1973).[5] And Borrower itself acknowledged the Business Plan's dedicated ballroom kitchen requirement—despite its subsequent unilateral "business decision…to not build out a second kitchen" (R. 2004). Borrower was not free to make "business decisions" that breached its Loan Documents.

Nor does the definition of "Completion" as "substantial completion" (R. 1436) absolve Borrower's construction failures, as Respondents imply (Respondents' Brief at 22). "Substantial completion" means completion of physical work so the property could be used fully[6] as intended (*DiSunno Architecture v Sheppard*, 18 AD3d 751, 752 [2d Dept 2005]; *Landow & Landow Architects, P.C. v Shorefront Jewish Geriatric Ctr.*, 289 AD2d 492, 493 [2d Dept 2001])—even if incidental work remains (*Phillips Constr. Co. v New York*, 61 NY2d 949, 951 [1984] [incidental work in construction of ice skating rink meant

---

[5] The same is true of all Business Plan headings and line items: "Rooftop," for instance, includes line items (Pool, Rooftop Pavers, Landscaping Roof, Water Tower Stairs, Restaurant Window, Rooftop Restaurant Structure) physically located on the Rooftop; "Water Tower Bar," likewise, includes line items (Windows, Exterior Cladding & Roof, Wall Paneling, Electric lighting & Fixtures, HVAC, Bar, Carpentry) physically located at the Water Tower Bar.

[6] While occupancy is one factor to be considered, it "is by no means determinative" (*Trustees of Columbia Univ. v Gwathmey Siegel & Assocs. Architects*, 167 AD2d 6, 12 [1st Dept 1991]). And even if occupancy mattered, the Loan Agreements required more than just "some" occupancy—they required "full occupancy" (R. 1436 ["Completion"]) and "full use and operation" of the Property (R. 1437 ["Critical Hotel Features"]). That means, of course, not only in the physical sense (all portions of the Property) but also in the temporal sense, so it could be used year-round—especially since the Business Plan contemplated "full-year all-weather operation" of the rooftop restaurant (R. 1841). Borrower's admitted failure to timely construct the enclosures meant the rooftop restaurant could not be operated year-round (R. 2131, 2194-2195).

11

"work on a single door frame"]; *New York Cent. Mut. Fire Ins. Co. v Glider Oil Co., Inc.*, 90 AD3d 1638, 1639 [4th Dept 2011]; ["the work in question was described as incidental…it was performed in a few hours on one day"]).

Borrower's construction failures here were not "on a single door frame" and could not be "performed in a few hours on one day." Borrower failed to construct an entire dedicated ballroom kitchen costing $250,000—the third-largest Business Plan cost item, exceeding 15% of the Business Plan's "Grand Total" (R. 1973)—and it failed to build the entire $68,270 enclosure of its rooftop restaurant (to say nothing of the restaurant's distinctive retractable awnings). Incomplete construction of more than $318,000—when the entire Business Plan construction cost $1,651,000 (*i.e.*, 20% of the total)—simply cannot be "incidental."

### D. Respondents Have Not Rebutted Their Demonstrated Failure To Exercise The Maturity Date Extension Option

Given their reliance on the sham notion that Borrower was prevented from extending the Maturity Date (Respondents' Brief at 23),[7] one would at least expect that Borrower was eligible for that extension, took the necessary steps to obtain that extension, and then met its self-appointed deadline to pay off the Loan by that extension. Turns out, and Respondents concede, none of that happened. Respondents' flimsy argument gets it nowhere.

---

[7]Bizarrely, while griping it was "deprived" of a Maturity Date extension, Respondents also claim BSP "refused to honor the maturity date extension" (Respondents' Brief at 27). Which was it?

### 1.    *Respondents Demand The Benefit Of An Extension For Which They Were Not Even Eligible*.—Respondents concede they were not even eligible for a Maturity Date extension to begin with. To be eligible, Borrower could not be in default (a) when it exercised the extension option, or (b) at commencement of the Extension Period—*i.e.*, the day after the initial, June 9, 2019 Maturity Date (R. 1469 [Loan Agreement §2.11(a)]). But even Respondents concede that defaults—including Borrower's failures to satisfy the Operating Condition (Point II.C) and to "discharge of record" all liens (Point II.A)—existed at both junctures. Respondents misinform that "all four mechanic's liens…were satisfied at or near the time of the extension option deadline" (Respondents' Brief at 14). But even if mere execution of satisfactions were enough to "discharge of record" the mechanic's liens as required (R. 1534 [Loan Agreement §10(h)])—and it was not (Point II.A)—three of the satisfactions were not even executed until June 12, June 13, and July 17, 2019 (R. 2171, 2173, 2176)—after the time Borrower could purport to exercise the extension (R. 1469 [Loan Agreement §2.11(b)]) and after the Extension Period would have begun. Borrower's inescapable defaults disqualified an extension.[8]

---

[8]  What's more, discharge of the liens "near" the Maturity Date extension deadlines (Respondents' Brief at 14) is not what was required—the liens had to be discharged "at" the Maturity Date extension deadlines (R. 1469 [Loan Agreement §2.11(a)]). They were not.

**2.** ***Respondents Demand The Benefit Of An Extension They Admittedly***

***Failed To Trigger***.—Respondents also concede satisfying none of the pre-

conditions to exercising the extension option:

> —Borrower failed to notify BSP of its election to extend
> (R. 1469 [Loan Agreement §2.11(b)]);
>
> —Borrower failed to deliver a Replacement Interest Rate
> Cap Agreement (R. 1469 [Loan Agreement §2.11(c)]);
>
> —Borrower failed to pay the $85,000 Extension Fee (R.
> 1469 [Loan Agreement §2.11(d)]); and
>
> —Borrower failed to deliver Guarantors' reaffirmation of
> their obligations (R. 1469 [Loan Agreement §2.11(f)]).

Respondents cannot possibly claim entitlement to an extension they concede

failing to effectuate—in several ways—in the first place.

**3.** ***Respondents Admit Failing To Pay Even By Their Self-Appointed***

***Extended Date***.—Had Respondents paid off the Loan by their make-believe

"extended" Maturity Date of December 9, 2019 (R. 1469 [Loan Agreement

§2.11]), their gripes might assist them (other than their admitted ineligibility and

failure to exercise the extension). But they did not: they have paid nothing in over

two years, blowing through not only the actual Maturity Date but even their own

make-believe "extended" one. So, at absolute bottom, even if Respondents were

eligible for an extension and had tried to trigger it (and they did neither), their

imagined extended Maturity Date cannot stave off summary judgment.

**Point III**

**RESPONDENTS FAIL TO ADDRESS—MUCH LESS STAVE OFF—
THE DISMISSAL OF THEIR REMAINING AFFIRMATIVE DEFENSES**

Respondents cannot stave off summary judgment by pinning their hopes on boilerplate "affirmative defenses" that are barred by Borrower's own agreements and fail in any event as a matter of law. Even Respondents appear to recognize as much, failing to oppose—and thus conceding—the dismissal of their defenses.

**A. Respondents Concede That They Waived All Affirmative Defenses**

BSP demonstrated Respondents' conclusive waiver in the Loan Documents of the right to assert any affirmative defenses[9] and the legal enforceability of such waivers (Opening Brief at 34).[10] Respondents did not even address—because they simply cannot rebut—either proposition, thus conceding their waiver of the right to interpose affirmative defenses (*see e.g. Steffan v Wilensky*, 150 AD3d 419, 420 [1st Dept 2017] ["By his silence in his opposition brief, defendant concedes, as plaintiff argues, that…"]). That alone disposes of Respondents' "affirmative defenses" definitively and as a matter of law.

\*     \*     \*

---

[9] R. 1464 [Loan Agreement §2.6(e)(iii)]; R. 1042 [Consolidated Mortgage §10.6]; R. 1240, 1244 [Guaranty §1.4 and §2.11].
[10] *JFURTI, LLC v Singal*, 171 AD3d 611 [1st Dept 2019]; *Bronx Overall Economic Dev. Corp. v DNA Auto. Corp.*, 127 AD3d 497, 498 [1st Dept 2015]; *Plaza Tower LLC v Ruth's Hospitality Group, Inc.*, 126 AD3d 579 [1st Dept 2015].

15

Even if Respondents had not waived all affirmative defenses, they fail to address (and certainly to stave off dismissal of) several of those purported defenses; those that are addressed fail as a matter of law.

### B. Respondents Have Not Staved Off Dismissal Of Their Standing, Waiver, Estoppel, Condition Precedent, And Set-Off Defenses

BSP showed that Respondents' standing, waiver, estoppel, condition precedent, and set-off affirmative defenses all fail as matter of law. By ignoring BSP's showing—because there is no coherent opposition—Respondents concede that these boilerplate "defenses" are legally insufficient and must be dismissed (*see e.g. Steffan v Wilensky*, 150 AD3d 419, 420 [1st Dept 2017] ["By his silence in his opposition brief, defendant concedes, as plaintiff argues, that…"]).

### C. Respondents Have Not Staved Off Dismissal Of Their "Satisfaction" Defense

BSP demonstrated (Opening Brief at 39) that only tender of "*all* mortgage arrears"—*i.e.*, "everything to which the mortgagee is entitled, including any interest or late charges"—might be a defense to a mortgage foreclosure (*United Cos. Lending Corp. v Hingos*, 283 AD2d 764, 766 [3d Dept 2001] [emphasis in original]; *First Fed. Sav. Bank v Midura*, 264 AD2d 407 [3d Dept 1999]; *Home Sav. of Am. v Isaacson*, 240 AD2d 633 [2d Dept 1997]).[11] A partial tender, in

---

[11] These cases are cited with approval in *Cassara v Wynn* (55 AD3d 1356 [4th Dept 2008]), Respondents' own authority for their misstatement that "tender" is a foreclosure defense (Respondents' Brief at 19-20).

contrast, is no defense to foreclosure and cannot preclude summary judgment (*Excel Capital Group Corp. v 225 Ross St. Realty, Inc.*, 165 AD3d 1233, 1235 [2d Dept 2018]; *Orchard Hotel, LLC v D.A.B. Group, LLC*, 106 AD3d 628, 630 [1st Dept 2013]). Even the trial court characterized Respondents' defense accurately as "partial satisfaction" (R. 11). But it erred in not dismissing it.

Neither Borrower nor the mezzanine lender tendered payment of *all* arrears (including the overdue Maturity Date payment, overdue Monthly Debt Service Payments, and default interest and associated fees) (Point I). Respondents also do not address BSP's showing that Borrower and the mezzanine lender failed to pay to BSP required costs and expenses (Point II.B). Respondents simply ignore the full tender requirement that mandates dismissal of their "satisfaction" defense (*see e.g. Steffan v Wilensky*, 150 AD3d 419, 420 [1st Dept 2017] ["By his silence in his opposition brief, defendant concedes, as plaintiff argues, that…"]).

### D. Respondents Have Not Staved Off Dismissal Of Their "Anticipatory Breach" Defense

Respondents' "anticipatory breach" case law stands for two pedestrian propositions: that a party anticipatorily breaches a contract by repudiating it before its time for performance arises, and that an anticipatory breach relieves the non-breaching party of its performance obligations (Respondents' Brief at 22-24). But then—in a single sentence, without analysis or authority—Respondents make the quantum leap to conclude that BSP's alleged refusal to recognize the mezzanine

17

lender's payments was an anticipatory breach that (conveniently) excused Borrower from all its Loan Agreement obligations, including the need to satisfy pre-conditions to a Maturity Date extension—and even to repay the Loan.

Respondents do not address any of the six reasons BSP established as to why its actions did not, and could not, constitute anticipatory breach (Opening Brief at 25-28). Nor do they cite a single case in which any court held a lender that already disbursed its loan to be in anticipatory breach of its loan agreements. And it's easy to understand why—because, as a matter of law, anticipatory breach:

— requires repudiation of a contract *before* the breaching party's time for performance (*Princes Point LLC v Muss Dev. LLC*, 30 NY3d 127, 133 [2017]; *Norcon Power Partners v Niagara Mohawk Power Corp.*, 92 NY2d 458, 462-463 [1998]);

— requires a complete refusal to perform, and a lender that already disbursed loan proceeds cannot possibly refuse to perform with respect to the entire contract (*Joseph P. Carrara & Sons, Inc. v A.R. Mack Constr. Co., Inc.*, 89 AD3d 1190 [3d Dept 2011]; *O'Connor v Sleasman*, 37 AD3d 954 [3d Dept 2007], *lv den*, 9 NY3d 806 [2007]).

To ignore these mandates and consider in anticipatory breach a lender that already disbursed its loan would relieve the borrower of its obligation to repay the already-disbursed loan—an "absurd result" that "New York law does not support" (*Red Fort Capital, Inc. v Guardhouse Prods. LLC*, 397 F Supp 3d 456, 470 [SD NY 2019]). And neither should this Court.

Respondents also ignore Borrower's own ratification of the Loan Agreement, even after BSP's alleged "anticipatory breach," in continuing to treat it

as valid and binding. So, for example, in January 2019, after Borrower knew that BSP found the mezzanine lender's December 2018 payment insufficient to purge Borrower's default—"anticipatory breach," according to Respondents—Borrower still pressed BSP to pay its latest construction draw request under the Loan Documents (R. 2136-2137). It then asserted, after the mezzanine lender made its four Monthly Debt Service Payments, that Borrower's financial obligations to BSP were satisfied—not because of any trumped-up "anticipatory breach" but only because it claimed (incorrectly) that no other payments were due (R. 2139). And contrary to its latest assertion that an "anticipatory breach" excused Borrower from having to exercise the Maturity Date extension, Borrower previously claimed it had tried to resolve its defaults specifically "so that it could exercise its right to extend the Loan" (R. 2139)—further ratification of the Loan Agreement.

Respondents' position is also foiled by their own counterclaim, which continues to reaffirm the Loan Agreement (R. 1419 ["The Loan Agreement is a valid and enforceable contract between Borrower and [BSP]"]). By choosing to reaffirm the Loan Agreement, Borrower remained obligated to perform under it (*Rebecca Broadway L.P. v Hotton*, 143 AD3d 71, 80-81 [1st Dept 2016]; *Computer Possibilities Unlimited, Inc. v Mobil Oil Corp.*, 301 AD2d 70, 80 [1st Dept 2002], *lv den*, 100 NY2d 504 [2003]). Respondents cannot have it both ways.

### E. Respondents Have Not Appealed The
### Dismissal Of Their "Culpable Conduct" Defense

Respondents maintain that BSP is barred from foreclosing by "culpable conduct," but that defense already was dismissed because it "is really a tort concept" (R. 10-11; *see Am. Express Equip. Fin. Corp. v Mercado*, 34 AD3d 880, 881-882 [3d Dept 2006]; *Nastro Contracting v Agusta*, 217 AD2d 874, 875 [3d Dept 1995]).[12] It is indeed a tort concept—and it was dismissed correctly.

### F. Respondents Have Not Staved Off
### Dismissal Of Their "Bad Faith" Defense

BSP established (Opening Brief at 32-33) that even a lender's bad faith cannot relieve a borrower's default unless the default was attributable entirely to the lender (*River Bank Am. v Daniel Equities Corp.*, 213 AD2d 929 [3d Dept 1995]; *Hatton v Quad Realty Corp.*, 100 AD2d 609, 610 [2d Dept 1984]; *Kaplan v 2108-2116 Walton Ave. Realty Co.*, 66 AD2d 668 [1st Dept 1978]). Respondents ignore this point. And no matter the flimsy and false "bad faith" Respondents retrospectively seek to cobble together, it could not possibly have "caused"— entirely or even partially—Borrower's many defaults here. That defeats Respondents' "bad faith" defense as a matter of law.

---

[12] While this dismissal was without prejudice (R. 10-11), that merely reserves a right to re-file in the future (*Semtek Int'l Inc. v Lockheed Martin Corp.*, 531 US 497, 505-506 [2001]). Respondents did not do so; they continue to argue on appeal that BSP's "culpable conduct is tortious in nature rather than sounding in breach of contract terms" (Respondents' Brief at 24). The dismissed "defense" is no bar to foreclosure.

### G. Respondents Have Not Staved Off
### Dismissal Of Their "Unclean Hands" Defense

Even though BSP's hands are clean, Respondents continue to invoke principles of equity without even acknowledging that, as BSP demonstrated, "a court of equity may not relieve a defaulting debtor from the consequences of his act merely because the results are harsh" (Opening Brief at 9-10)—particularly where (as here) sophisticated parties have entered into a complex commercial transaction (*First Nat'l Stores, Inc. v Yellowstone Shopping Center, Inc.*, 21 NY2d 630, 638 [1968]; *Graf v Hope Bldg. Corp.*, 254 NY 1 [1930]; *In re CPG Constr. & Dev. Corp. v 415 Greenwich Fee Owner, LLC*, 2012 NY Slip Op 33404(U), **22 [Sup Ct, NY Co 2012] *aff'd*, 117 AD3d 623 [1st Dept 2014]; *Key Intl. Mfg. v Stillman*, 103 AD2d 475 [2d Dept 1984], *aff'd as mod on other grounds*, 66 NY2d 924 [1985]). "Unclean hands" is simply no defense to a mortgage foreclosure.[13]

Even pretending it was, Respondents' garden-variety gripes simply do not rise to the "monstrously harsh" or "shocking to the conscience" level necessary to invoke unclean hands (*Domus Realty Corp. v 3440 Realty Co.*, 179 Misc 749, 754-755 [Sup Ct, NY Co 1943], *aff'd*, 266 AD 725 [1st Dept 1943]; *see Levkoff v Soho*

---

[13] Unclean hands is no defense to a foreclosure action (*Jo Ann Homes at Bellmore, Inc. v Dworetz*, 25 NY2d 112, 122 [1969]; *Phh Mtge. Corp. v Davis*, 111 AD3d 1110, 1112 [3d Dept 2013], *lv dismissed*, 23 NY3d 940 [2014]; *Vanderbilt Mtge. & Fin. Inc. v Davis*, 2013 NY Slip Op 32117(U), **4 [Sup Ct, Suffolk Co 2013] ["It is well-settled that the doctrine of unclean hands is not a defense to a mortgage foreclosure action"]; *Metropolitan Bank & Trust Co. v Wittich*, 2007 NY Slip Op 33440(U), **6-7 [Sup Ct, Suffolk Co 2007] ["Courts have repeatedly rejected unclean hands as a defense to mortgage foreclosure"]). This case is no exception.

*Grand-West Broadway, Inc.*, 115 AD3d 536 [1st Dept 2014]; *Citibank, N.A. v American Banana Co., Inc.*, 50 AD3d 593, 594 [1st Dept 2008]). Neither BSP's alleged refusal to recognize a non-existent Maturity Date extension (Point II.D), nor its alleged failure to overlook Borrower's construction shortcomings (Point II.C), nor its holding Borrower in default for failing to pay its Loan Agreement obligations (Point I) constitutes unclean hands. On the contrary, BSP's mere exercise of its contractual rights under a mortgage cannot, as a matter of law, be immoral or unconscionable or constitute unclean hands (*Graf*, 254 NY at 4; *Bank of Smithtown v 264 W. 124 LLC*, 105 AD3d 468, 469 [1st Dept 2013]; *Key Intl.*, 103 AD2d at 478)—another point Respondents fail to address and thus concede.

Nor, as required for an unclean hands defense, did Respondents show how BSP "caused" Borrower's defaults (*Agility Funding, LLC v Wholey*, 119 AD3d 1168, 1170 [3d Dept 2014]; *Phh Mtge. Corp.*, 111 AD3d at 1112-1113). BSP never prevented Borrower from performing or causing it to default. BSP's hands are squeaky clean.

**Point IV**

## RESPONDENTS FAIL TO ADDRESS—MUCH LESS STAVE OFF— THE DISMISSAL OF THEIR SOLE REMAINING COUNTERCLAIM

As with their sundry affirmative defenses, Respondents' sole remaining counterclaim cannot stave off summary judgment: it is barred by Respondents' own express counterclaim waiver, it fails regardless as a matter of law, and, at absolute bottom, it should be severed. It poses no obstacle to summary judgment.

### A. Respondents Concede That They Waived The Right To Counterclaim

Confronted by their own several explicit counterclaim waivers (R. 1545 [Loan Agreement §14.9], 1042 [Consolidated Mortgage §10.4], 1240, 1244 [Guaranty §1.4 and §2.11]), Respondents urge the Court to adopt a new rule striking down such waivers where the lender's "wrongful" conduct allegedly caused the borrower's default. No such rule exists.

Lacking authority for their new rule, Respondents instead cite out-of-context dicta from a bankruptcy court case and a Brooklyn trial court decision. In *In re Republic Airways Holdings Inc.*, a bankruptcy court held that a specific guarantee (which incidentally also included a counterclaim waiver) was unenforceable because its "liquidated damages clause[]…violated public policy"—but that court never questioned the validity of the counterclaim waiver itself (598 BR 118, 147 [Bankr SD NY 2019]). Just the opposite: it reaffirmed that "[i]t is not against public policy to enforce a waiver of the right to interpose counterclaims…and such

23

a waiver constitutes an insurmountable obstacle to defendants' attempt to assert these defenses and counterclaims" (*In re Republic*, 598 BR at 145). In *MCC Funding LLC v Diamond Point Enters., LLC*, a Brooklyn trial court upheld a counterclaim despite a waiver but only because the counterclaim alleged fraud and thus fell within an exception to the general enforceability of such waivers[14] (36 Misc 3d 1206(A) [Sup Ct, Kings Co 2012]). Neither case is controlling or even persuasive, nor do they support the new rule Respondents urge the Court to adopt.

To permit Respondents to welch on their explicit and unconditional counterclaim waivers would not only be contrary to law (*see e.g. JPMCC 2007-CIBC19 Bronx Apts., LLC v Fordham Fulton LLC*, 84 AD3d 613, 613 [1st Dept 2011] [counterclaim waiver is an "insurmountable obstacle" to counterclaims in a foreclosure action]; *Red Tulip, LLC v Neiva*, 44 AD3d 204, 209 [1st Dept 2007], *lv dismissed* 10 NY3d 741 [2008]), it would also reward Respondents' own fraud in deliberately misrepresenting their true intentions when they signed those waivers (*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank Intl.," NY Branch v Navarro*, 25 NY3d 485, 495 [2015] ["a guarantor cannot seek to benefit from the guarantor's own fraudulent promise that the guaranty is 'absolute and unconditional'"]; *Citibank, N. A. v Plapinger*, 66 NY2d 90, 95 [1985] [same]).

---

[14] A counterclaim "waiver is not against public policy and will be enforced in the absence of fraud or negligence in the disposition of collateral" (*North Fork Bank v Computerized Quality Separation Corp.*, 62 AD3d 973, 974 [2d Dept 2009]). Respondents allege no fraud here (because there was none); their sole remaining counterclaim is for breach of contract.

But, for at least three reasons, even Respondents' skewed version of the law does not assist them.

First, several of Borrower's defaults occurred before—and thus could not possibly have been caused by—BSP's "wrongful" conduct (*Red Tulip*, 44 AD3d at 211): (i) all four mechanic's liens were filed against the Property and remained undischarged of record for forty-five days even before BSP's December 10, 2018 Notice of Default (R. 1839-1840, 2170, 2172, 2174-2175, 2177); and (ii) Borrower failed to pay Monthly Debt Service Payment on December 7, 2018 (R. 1835), which necessarily pre-dated BSP's December 10, 2018 Default Notice for Borrower's failure to make that payment (R. 2133-2134).[15]

Second, BSP's conduct was not "wrongful"; it was fully consistent and in accordance with the Loan Agreement:

> —BSP correctly applied a 0.5% interest rate—expressly permitted by the Loan Agreement (R. 1444 ["LIBOR Rate"])—when Borrower failed timely to achieve the Operating Condition or deliver TCOs (R. 1841).

> —BSP did not gift borrower a "credit" for any 0.5% "overpayment" because the interest rate increase was expressly permitted by the Loan Agreement (R. 1444). There was no "overpayment" to begin with.

---

[15] Even if the mezzanine lender's subsequent payment of Monthly Debt Service could "cure" Borrower's default (and, as explained in Point I.B, it could not), BSP's December 10, 2018 default declaration was justified since it predated even the mezzanine lender's December 19, 2018 purported cure payment (*compare* R. 1322-1347 and R. 1415, 1736-1737, 2135, 2187).

—BSP declared Borrower in default because Borrower was in default (Points I and II; Opening Brief at 10-23).

—BSP did not deny any cure efforts; Borrower's defaults could not be and were not "cured" by the mezzanine lender, whose payments were inadequate (Point I.B).

Merely exercising contractual rights under a loan agreement cannot be "wrongful" (*Graf*, 254 NY at 4; *Bank of Smithtown*, 105 AD3d at 469; *Home Sav. of Am.*, 240 AD2d at 633; *New York Guardian Mortgagee Corp. v Olexa*, 176 AD3d 399, 401 [3d Dept 1991]; *Key Intl.*, 103 AD2d at 478). And that's all BSP did here.

Finally, as a matter of common sense and indisputable fact, BSP's mere notice of default could not possibly "cause" Borrower's: (i) failure to repay the Loan on the Maturity Date; (ii) failure to pay Monthly Debt Service Payments when due; (iii) failure to timely "discharge of record" the liens; (iv) failure to timely satisfy the Operating Condition; or (v) failure to reimburse BSP's costs and expenses. And Respondents never explain otherwise.

## B. Respondents' Sole Remaining Counterclaim—Alleging "Breach" Of Contract—Fails As A Matter Of Law

Even if not barred by their own counterclaim waiver (which they are), Respondents' one remaining counterclaim, for "breach of contract," fails: because of Borrower's undisputed defaults, BSP followed, and, as a matter of law, did not breach, the Loan Agreement (Opening Brief at 40-43). Respondents failed even to address Borrower's several defaults that eviscerate this counterclaim.

26

BSP invoked this Court's decision in *Orchard Hotel, LLC v D.A.B. Group, LLC*, which held that Respondents' very allegations here—lender "grossly exaggerated the amount necessary to fully satisfy the loan by miscalculating interest and purported late charges due," preventing borrower from satisfying or refinancing its loan—failed as a matter of law (106 AD3d 628, 630 [1st Dept 2013]). Respondents ignored this Court's precedent.

BSP established as a matter of undisputed fact that even the conduct alleged by Respondents did not state a claim for breach of the Loan Agreement. Respondents simply parroted the elements of a breach of contract claim and regurgitated the rank allegations in their counterclaim (R. 1419). That is, Respondents ignored BSP's showing.

And BSP showed that any claimed breach of the Loan Agreement involving the alleged denial of a Maturity Date extension is moot, since, even if Borrower were eligible to exercise the option (it was not [Point II.D.1]) and even if Borrower satisfied all necessary pre-conditions to doing so (it did not [Point II.D.2]), the "extended" Maturity Date would have been December 9, 2019 (R. 1469 [Loan Agreement §2.11]) and that date has passed without repayment (R. 2181-2182). Again, Respondents just ignore.

## C. Even If Respondents' Remaining Counterclaim Could Survive Dismissal, It Should Have Been Severed So BSP Could Foreclosure

In opposing severance of its remaining counterclaim, Respondents rely mainly on a case (*Lelekakis v Kamamis*, 41 AD3d 662 [2d Dept 2007]) that does not even involve foreclosure and is thus inapplicable here.

While severance might be inappropriate in non-foreclosure cases (where counterclaims could offset monetary damages owed to the plaintiff), it is most appropriate in foreclosure actions (*CSMC 2007-C1 Oswego Rd., LLC v Kimbrook Rte. 31, LLC*, 120 AD3d 1539, 1541 [4th Dept 2014] [affirming order severing foreclosure action counterclaim that plaintiff's wrongful refusal to release certain escrow funds "caused" defendants' default]; *First Union Mortg. Corp. v Fern*, 298 AD2d 490, 491 [2d Dept 2002]; *Tri-Land Props. v 115 W. 28th St. Corp.*, 238 AD2d 206 [1st Dept 1997]; *Norton Co. v C-TC 9th Ave. Partnership*, 198 AD2d 696, 698 [2d Dept 1993]; *Fleet Bank v Pine Knoll Corp.*, 290 AD2d 792, 794 [3d Dept 2002] [affirming severance of counterclaim for breach of contract over "plaintiff's failure to provide the additional financing allegedly promised" because it was not "inextricably interwoven" with plaintiff's foreclosure claim]; *Marine Midland Bank, N.A. v Cafferty*, 174 AD2d 932, 934-935 [3d Dept 1991] [affirming sua sponte order severing defendant's counterclaim—like Respondents' phony one here—that "plaintiff prevented refinancing and foreclosure became the only

alternative"]; 3 Bergman on New York Mortgage Foreclosures 21.07 [2020]). This case is no exception.

Because it permits efficient adjudication and recovery of mortgage debt—especially where, as here, the lender's entitlement to foreclosure is unrebutted and irrefutable—courts routinely sever foreclosure action counterclaims (*see e.g. Norton Co.*, 198 AD2d at 698; *Marine Midland Bank, N.A. v Berley*, 90 AD2d 646, 646-647 [3d Dept 1982]; 3 Bergman on New York Mortgage Foreclosures 21.07). The trial court, at absolute bottom, should have done so here.

## Conclusion

The Decision should be reversed, and BSP should be granted such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            January 4, 2020

                              SCHWARTZ SLADKUS REICH
                              GREENBERG ATLAS LLP
                              *Attorneys for Plaintiff-Appellant*

By: _____
                  Ethan A. Kobre
            444 Madison Avenue
            New York, New York 10022
            (212) 743-7000

**PRINTING SPECIFICATIONS STATEMENT**

I hereby certify under 22 NYCRR 1250.8(j) that the foregoing brief was prepared on a computer using the Microsoft Word 2010 processing system, to these specifications:

*Typeface*: Times New Roman

*Font Size*: 14 Point

*Line Spacing*: Double

*Word Count*: This brief contains 6,753 words, inclusive of all headings and footnotes, and exclusive of the table of contents, table of authorities, and this statement.

Dated:       New York, New York
             January 4, 2020